[Crim. No. 6474.   Second Dist., Div. One.   May 19, 1959.]

THE PEOPLE, Respondent, v. DAVID ALBERT
SHAPIRO, Appellant.

G. Vernon Brumbaugh for Appellant.

Stanley Mosk, Attorney General, Edward M. Belasco and Warren H. Deering, Deputy Attorneys General, for Respondent.

FOURT, J.—This is an appeal from a judgment of conviction of the crime of violation of section 653f, Penal Code (soliciting a bribe).

In an indictment in Los Angeles County, the appellant, a duly appointed, commissioned and acting agent of the Department of Alcoholic Beverage Control, was accused of committing three felonies. In count I it was charged that the appellant committed the crime of bribery in violation of section 68, Penal Code, for corruptly asking for and agreeing to receive a bribe in the sum of $300 from Fernando J. Galluccio (sometimes hereinafter referred to as the "owner"), and Anthony Schiavone (sometimes hereinafter referred to as the "manager"), for the purpose of influencing appellant's action, vote and opinion upon an agreement and understanding that appellant's action, vote and opinion upon a matter concerning violations of the Alcoholic Beverage Control Act, and

of the rules enacted and adopted by the Department of Alcoholic Beverage Control, pursuant to such section would be unlawfully and unjustly influenced thereby. In count II, it was charged that the aforesaid actions constituted a different offense of the same class of crime as charged in count I, and for the commission of these actions appellant violated section 653f of the Penal Code in that he feloniously solicited the owner and the manager to commit and join in the commission of the crime of bribery. In count III, it was charged that the aforesaid actions constituted a different offense of the same class of crimes as charged in counts I and II, and by the commissions of these actions appellant committed the crime of grand theft in violation of section 487, subdivision 1 of the Penal Code. The appellant pleaded not guilty, and in open court with his counsel, waived his right to be tried before a jury; trial was held before the court sitting without a jury. Evidence was introduced, and at the conclusion of the trial the court found appellant not guilty on counts I and III, and guilty on count II. Appellant made an application for probation, which was denied, and appellant was thereupon sentenced to imprisonment in the state prison for the term prescribed by law. Appellant appeals from the judgment of conviction.

A résumé of the facts most favorable to the respondent is as follows: In March, 1958, appellant was an agent of the Department of Alcoholic Beverage Control (hereinafter referred to as the "Department"), and had been so employed for over eight years. The appellant worked in the wholesale unit which was under the general supervision of Wallace Montgomery, with Joseph Wofford as agent in charge of the unit.

The function of the wholesale unit was to investigate fair trade violations by liquor licensees as the rules and regulations by the Department generally limited discounts on liquor sales to customers to 10 percent per case. If a wholesale unit agent returned from an investigation and reported that a liquor licensee was giving an illegal discount on liquor sales to customers, usually an accusation would be filed with the Department against the licensee. Further, if the charges in the accusation were found to be true, a suspension from doing business for from five to 30 days would ordinarily be imposed on the licensee by the Department. In the course of investigating a fair trade violation, an investigator, if he discovered a situation involving a false ownership violation, would continue his investigation and mention such fact in his report to his office.

In the latter part of 1957, or early in 1958, Charles Cameron, Supervisor of the Department's Van Nuys office, received a complaint that the Airport Liquor Store in Burbank was selling liquor to employees of an airline at a 15 percent discount. Cameron forwarded this complaint to the Department's wholesale unit in Los Angeles. In March, 1958, appellant was handed the complaint by Wofford, which was the customary method of assignment. Attached to the complaint was an assignment form sheet instructing appellant to make an investigation at the address shown in the complaint.

On March 26, 1958, at about 3 o'clock p.m., appellant went to the Airport Liquor Store, which was licensed under an off-sale general license in the names of its owners, Mr. and Mrs. Fernando Galluccio. The general manager of the liquor store was Anthony Schiavone. The manager and one of the clerks were on the premises at the time the appellant arrived, and appellant asked to see the owner. Upon being informed that the owner was out and that Schiavone was the general manager, appellant stated that he would talk with him and thereupon identified himself as an agent of the Department.

The manager asked the appellant if there was any trouble and appellant replied, "Perhaps." The manager invited the appellant into the office where the appellant inquired whether liquor was sold or delivered outside of the premises. Upon being answered in the affirmative, the appellant asked if invoices were made out, and the manager replied that they were not made out except when a charge sale was made.

The appellant proceeded to look around the office, opening and looking into drawers, cubby holes and the desk. The manager asked the appellant a few times what the trouble was and received the reply, "Well, maybe there is trouble, may there isn't." When the manager stated that he did not think the appellant had any right to look into personal drawers of the company, the appellant replied in effect, that he had the right to do anything he pleased. When the manager again inquired what the trouble was, appellant stated, "It seems like we have evidence that you have been selling liquor at fifteen percent below retail." The manager told the appellant that he knew of no instances when liquor was sold for 15 percent below retail, to which the appellant replied, "Well, I will be happy to know different."

The appellant then took a piece of paper about 6 by 8 inches out of his pocket and showed it to the manager. The paper contained a typewritten statement that liquor could be

purchased at the store at 15 percent below retail, and it was signed by a person from Slick Airways. The manager told the appellant that he had never seen the paper before and did not believe that the owner had given anybody authority to typewrite a paper like that. The manager asked appellant how he got the paper, to which the appellant replied, ''Well, you might make some enemies among salesmen or some of your competitors or Mr. Galluccio's competitors might turn these things over to us. We have various ways of getting these things.'' The manager told appellant that sales of champagne were made to airlines for flights going to Las Vegas, Del Mar, and some other places, and that there were invoices for such sales. The appellant said, ''Well, it looks like we're going to have to shut you down for ten or fifteen days.'' The manager asked, ''Well, why should we be shut down? What did we do to be shut down?'' and appellant replied, ''Well, we have evidence here that you have been selling liquor at fifteen percent below retail.'' The manager insisted that such was not true.

At about 3:30 o'clock p.m., Edward Hermann, a representative of Seagram's Distillery, and Richard C. Glouner, a liquor salesman for McKesson and Robbins, Inc., entered the premises and went to the back of the store where they saw the manager with appellant in the office near the warehouse. The manager stepped out of the office to see Hermann and Glouner, and told them he was busy, and that there was an investigator from the Department in the office. Hermann had seen the appellant before and knew of his position, and likewise he had been to the liquor store once before at which time he had met the owner.

Later the appellant came out of the store office and was greeted by Hermann who then introduced appellant to Glouner. The manager at that time stayed in the office. During this first conversation between appellant, Hermann and Glouner, they discussed the reason appellant was at the store, and appellant said the manager was in trouble concerning the ownership of the store, and also appellant showed Hermann and Glouner the complaint letter, and appellant told Hermann and Glouner to show the letter to the manager if the latter wanted to see what kind of trouble he was really in.

Hermann and Glouner then took the letter back to the office while appellant remained in the front portion of the store, looking in various drawers and in a book with various names in it. Hermann and Glouner showed the letter to the manager,

who said, "Oh, gimminy," or something to that effect, and said, "What do you think will happen?" Hermann replied, "I don't know." Glouner mentioned something to the manager to see if they could get it straightened out. Hermann and Glouner then took the letter back to the appellant and Glouner asked appellant if the matter could be straightened out, and appellant said for $300 he could square it.

Glouner and Hermann then went back to the office and talked to the manager, and either Glouner or Hermann told the manager that appellant said it would cost $300 to take care of it. The manager said, "I don't have that kind of money here." Hermann came out and retold this to the appellant, and appellant stated he did not know whether he could come back.

Appellant then went back to the store office, where he had a conversation with the manager. The first thing appellant said to the manager was, "I talked to Hermann, . . . Is everything satisfactory?" The manager stated, "Now, when I give you this $300.00 . . . are you going to come back and get more money or— . . . are you going to keep pestering me for money?" Appellant said, "As far as this beef is concerned, I am not getting no part of this $300.00. I got to fix up the boys in the office." The appellant said that this was no shakedown, and that he was doing this as a personal favor to the manager because he, the manager, seemed like a nice person, and the $300 would go to the fellows in the office. The manager told appellant that if he, the appellant, did not come back and ask for any more money, "everything will be fine. I will have the money for you tomorrow." The appellant said, "as far as this beef is concerned, this is all we'll want."

Appellant stated at the store that the office setup was that the letter comes down from Sacramento to the office, and it is turned over to outside investigators. Appellant stated that if the "beef" turned out unfavorably for the manager, the place would be investigated. Appellant and the manager agreed to meet the next morning at 11.

Hermann overheard part of the foregoing conversation between the appellant and the manager. Hermann heard the manager say that he did not have that kind of money with him in the store, and that he would give it to the appellant the next day, and heard appellant reply that he did not want to come back but he would be back the next morning. Appellant left the liquor store prior to the time Hermann and Glouner left.

That evening the manager attempted to contact a member of the Burbank police department but was unsuccessful.

On the next day, March 27, 1958, the manager was at the liquor store when the owner arrived at 8 o'clock a. m. The manager told the owner about appellant and then contacted George Carsten, a member of the Burbank police department, who was also employed on Fridays as a guard at the liquor store. Carsten arrived at the liquor store about 10:15 or 10:30 o'clock a. m., when the manager and the owner were at the store, and he instructed the manager to go to the bank.

The manager withdrew $800 from the bank, of which $500 was for use in the business, and upon his return to the store handed $300 to Carsten who copied some of the serial numbers from the bills and handed the money to the owner. Carsten attached a recording device to the owner, and explained to him how to use it.

Appellant arrived at the liquor store about 10:45 o'clock a. m., at which time the manager was behind the counter and the owner was between the counter and the office. Carsten remained in the back part of the warehouse. Appellant was greeted by the manager, who introduced him to the owner saying, "This is the owner of the place, Mr. Galluccio." The owner left appellant for a few minutes for the purpose of adjusting the recording device, and then returned and had a conversation with him. Appellant conversed about the remodeling of the store and wandered about for four or five minutes looking around the place and also out in the warehouse portion.

Appellant and the owner then went to the office of the store where they had a conversation. The manager overheard a part of that talk. The manager heard the owner ask appellant for the paper and he observed appellant pull out an envelope and the owner take a piece of paper out of such envelope. The owner stated to the appellant that he did not know where the paper had come from. Appellant stated it looked as if the owner was in trouble and said, "We might have to investigate here and all that." Appellant said that the investigation would be about 15 percent discount dealings. The owner asked appellant for his identification card which appellant displayed. The appellant and the owner then conversed about selling liquor at a 15 percent discount and the owner denied any such sales.

The owner told the appellant that he thought $300 was

too much, to which appellant replied, "I am not even sure they are going to go for the three hundred. . . . That's pretty cheap." The appellant told the owner that there were two other fellows at the office to whom he had to give $100 each, and of course all that wasn't going to him. The owner said, "I don't know why we should pay any money. We haven't done anything." To which the appellant said, "Well, that's up to you."

Carsten, who had gone from the storeroom area and crouched below the cashier's window of the office, heard the appellant and the owner conversing in the office, but he could not determine what was said.

Appellant told the owner he wanted $300, and the owner stated, "How about $200.00?" and appellant replied, "No. . . . Let's forget the whole thing," and further stated that they could land in jail. The owner said, "Well, I don't want no investigation around here. . . . I'll give you the $300.00. . . . If I give you the $300.00 will I have any more trouble with you later? . . . Maybe you might come back later and you'll want some more." Appellant replied, "Well, . . . I'm not sure, it might be enough. Maybe it isn't enough." The manager then came into the office and joined the conversation. The manager said, "Mr. Shapiro, how do I know this shakedown isn't going to go on after we give you this money?", and appellant stated, "Don't call this a shakedown. This is no shakedown. . . . As far as this beef is concerned, this is going to take care of it," or words to that effect.

Appellant glanced out of the window and observed Carsten crouched below the cashier's window of the office. Carsten jumped up, told the appellant to put his hands over his head and entered the office. He made a fast search of the appellant for the $300 which had been marked, but did not find it on the appellant. The manager heard appellant say, "You don't got anything on me," to which Carsten replied, "Oh, yeah?", and pulled back the owner's jacket and said, "We got it all on tape."

Carsten observed the $300 was still in the owner's possession, and the owner started to hand the $300 to the appellant and Carsten grabbed the owner's arm. Appellant would not take the money and stated he wanted no part of it at that time. The appellant stated that he wanted to call his office and an attorney, and Carsten would not permit him to do so at that time. Carsten also refused the appellant's request to

call Mr. Cameron of the Department's Van Nuys office. The owner handed the money to the manager, who then said to appellant, "Go ahead, Shapiro, take the money, let's forget about that. I don't want to become involved in any political deal or anything like that, just take the damned money." Appellant said, "No, I'll not take no money." The manager asked Carsten to let the appellant go, and Carsten did permit his release.

Carsten told the manager in the doorway of the office, about 8 or 10 feet from where the appellant was seated in the office, that he thought the case had "blown" because appellant did not have the money on him and Carsten did not know what was in the recording. After Carsten left for the police station and took the recording device with him, the manager walked outside the store with the appellant, who said, "I'm not taking the $300.00." The appellant referred to the owner in some uncomplimentary terms for "setting him up on a deal like that." The manager remarked to appellant, "Well, how would you feel if you was in Mr. Galluccio's place? . . . How would he know you wouldn't be coming back time after time for money?" The appellant replied, "I told you as far as this one beef was concerned I wouldn't be back." The manager then asked the appellant to take the money and appellant stated in effect that he would not take the money unless he could get the tape recording, and finally said, "You try. I will do anything for that tape recording. These guys are going to flip their lids in the office when I don't bring back the money." The manager then said, "Well, here, you bring them back the money." Appellant replied, "Now, look, just understand this; I am not getting a damned cent. It was never my intention to get a damned cent. This money was going to the two fellows in the office."

The appellant and the manager then got in the car and the manager laid the money down and said, "Go ahead, Shapiro, take it." Appellant then, in effect, requested the manager to do everything he could to secure the tape recording, and while in the car appellant stated that he would square the beef, and that the money was going to the two men in the office, but he did not mention their names.

When the manager left the automobile, the appellant took the $300 and put it in his inside pocket. The manager stated that he gave the money to the appellant because he, the manager, was scared.

The appellant made no report to his superiors of the incidents at the Airport Liquor Store on March 26 and March 27, 1958.

On the evening of March 28, 1958, George Dennett, a special agent of the Department, went to the Department's offices in Los Angeles and searched Wofford's desk, appellant's desk and all of the files in the vicinity and found no report relative to an investigation at the Airport Liquor Store. Dennett found appellant's daily work sheet for March 25th, but found none for the 26th and 27th of March.

On March 31, 1958, Dennett again searched the same office and found the aforesaid work sheet crumpled in the waste basket. There was testimony that it was customary for an agent to make reports of his investigation and to complete a daily work sheet reflecting his activities for the day. Montgomery found no reports in his files relative to an investigation of the liquor store in question; nor did he find any work sheet turned in by the appellant for the 26th and 27th of March, although he had requested the appellant to turn in such a work sheet. Neither Montgomery nor Wofford, the appellant's supervisors in the Department, received any portion of the $300, nor did Montgomery instruct or authorize the appellant to collect $300 from the liquor store to quash a "beef."

About a week or 10 days after the incident of the 27th, Hermann received a telephone call from appellant, who said that if Hermann was called by anyone, "You better tell your buddy to keep his mouth shut."

On April 16th or 17th, appellant was questioned in the district attorney's office by Dennett and a Mr. McNary. Appellant was asked what happened at the Airport Liquor Store and appellant stated that he had not been there and did not know where it was.

Appellant asserts:

(1) The evidence is insufficient as a matter of law to sustain the judgment;

(2) The verdicts of not guilty on count I (Bribery), and the finding of guilt on count II are inconsistent as a matter of law, and the verdict of guilty cannot stand.

A bribe is defined by section 7, subdivision 6 of the Penal Code, as follows:

"The word 'bribe' signifies anything of value or advantage, present or prospective, or any promise or undertaking to give

any, asked, given, or accepted, with a corrupt intent to influence, unlawfully, the person to whom it is given, in his action, vote, or opinion, in any public or official capacity; ..."

Penal Code, section 653f, provides as follows:

"Every person who solicits another to offer or accept or join in the offer or acceptance of a bribe, or to commit or join in the commission of murder, robbery, burglary, grand theft, receiving stolen property, extortion, rape by force and violence, perjury, subornation of perjury, forgery, or kidnapping, is punishable by imprisonment in the county jail not longer than one year or in the state prison not longer than five years, or by fine of not more than five thousand dollars. Such offense must be proved by the testimony of two witnesses, or of one witness and corroborating circumstances."

The corpus delicti consists of the asking and the intent. It was said in *People* v. *Rissman*, 154 Cal.App.2d 265, at pages 275-276 [316 P.2d 60], "When any person solicits another to offer or join in the offer of a bribe, the solicitor has committed the offense described in section 653f. (Citing case.) The gist of the offense is the solicitation to offer or join in the offer of a bribe, and not the commission of bribery. (Citing cases.) The intent may be gathered from the surrounding circumstances. (Citing case.) A contemplated overt act is not an essential element of the offense denounced by section 653f. The offense 'is complete when the solicitation is made, and it is immaterial that the object of the solicitation is never consummated, or that no steps are taken toward its consummation.' "

Appellant asserts that the idea of offering money to the appellant originated with Hermann, Glouner and the manager, and further that Hermann, Glouner and the manager solicited him, the appellant. There has heretofore been set forth a rather extensive résumé of the evidence, and it is clear that appellant's position cannot be sustained. In any event, the origin of the idea is not the true test. (See *People* v. *Wayne*, 41 Cal.2d 814, 825 [264 P.2d 547].) In our opinion it was clearly established that it was the intent of appellant to solicit another to offer and to join in the offer of a bribe.

In this particular case there were at least three separate, distinct solicitations by the appellant. The People's case was bolstered by the presence of two witnesses, or at least of one witness and corroborating circumstances. The tape recording strongly supports the guilt of appellant (see *People* v. *Willmurth*, 77 Cal.App.2d 605, 612 [176 P.2d 102]) ; furthermore,

on the morning of the 27th the appellant was observed by the witness Carsten to be looking around the store, the office and the back room. This, coupled with the fact that shortly thereafter the appellant, for no apparent reason, looked over the cashier's window and discovered Carsten crouched there, can lead only to the conclusion that the appellant was apprehensive that someone might be observing the transaction.

Further, the appellant, although a public official charged with enforcing the Alcoholic Beverage Control Act, did not report the incidents of the 26th and 27th of March to his superiors, nor did his superiors receive any report of the appellant's investigation of the liquor store. Appellant apparently made out no work sheets for the days in question. Also, there is the undisputed fact that on April 16th, when the appellant was questioned in the district attorney's office, he denied any knowledge of the Airport Liquor Store and denied ever having been there. (See *People* v. *Simpson,* 43 Cal.2d 553, 565 [275 P.2d 31].) Also, there is the fact that about a week or 10 days after March 27th, appellant telephoned Hermann and told him that he had better tell his "buddy" to keep his mouth shut. (See *People* v. *Weiss,* 50 Cal.2d 535, 554 [327 P.2d 527].)

In his second contention the appellant argues in effect that since the essential elements necessary to constitute a violation of Penal Code, section 653f, as set forth in count II, are the same as those necessary to constitute a violation of Penal Code, section 68 (count I), an acquittal upon the latter must logically and necessarily constitute an acquittal of the former.

There can be no question that the charges contained in counts I and II relate to the same general factual situation. However, section 954 of the Penal Code provides in part as follows:

"An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated. The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged, and each offense of which the defendant is convicted must be stated in the verdict or the finding of the court; provided, that the court in which a case is triable, in the interests

of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately. *An acquittal of one or more counts shall not be deemed an acquittal of any other count."* (Emphasis added.)

The italicized portion of the quoted section was added in 1927 "probably to avoid the result of those cases which interpret inconsistent verdicts as acts of stupidity, rather than acts of leniency." *(People* v. *Horowitz,* 131 Cal.App.Supp. 791, 794 [19 P.2d 874].)

In *People* v. *Ranney,* 123 Cal.App. 403 [11 P.2d 405], it was said (at p. 406) :

". . . It may be conceded that the jury was inconsistent in convicting the defendant upon these two counts and acquitting him upon the remaining five counts of the indictment. It may be true that a reconciliation of these opposing verdicts should have required the conviction of the defendant upon all seven of the counts. The motive which prompted the jury to acquit the defendant upon five counts of the indictment is not before this court on appeal. The only question which is presented to this court in that regard is whether there is sufficient evidence to sustain the verdict of guilty with respect to the fifteenth and seventeenth counts. . . ."

In *People* v. *Villa,* 156 Cal.App.2d 128 [318 P.2d 828], the court said (at p. 133) :

". . . Under this section, each count charging a separate and distinct offense must stand or fall on its own merits. The disposition of one count has no effect or bearing upon the other counts. This is so even though the respective verdicts in the various counts may be logically inconsistent. *(People* v. *McCree,* 128 Cal.App.2d 196 [275 P.2d 95] ; *People* v. *Codina,* 30 Cal.2d 356 [181 P.2d 881] ; *People* v. *Ranney,* 123 Cal.App. 403 [11 P.2d 405].)"

In any event the offenses alleged in the separate counts in this case are not identical. In count I the appellant was charged with asking for, receiving and agreeing to receive $300 for the purpose of influencing appellant's own action as an executive officer in violation of section 68, Penal Code; count II charged appellant with soliciting others to commit and join in the commission of the crime of bribery in violation of section 653f. The difference is obvious.

Had appellant been convicted upon count I and count II, he could not, on the evidence before us, have successfully

argued that the verdicts were inconsistent, even though they pertain to the same transaction. (*People* v. *Megladdery*, 40 Cal.App.2d 748, 780-781 [106 P.2d 84].) In this case the appellant made reference several times to the fact that third persons were to be the recipients of the $300, and that he was not to benefit therefrom. Perhaps the court was influenced thereby.

In any event, it is clear that it was a benefit and not a detriment to the appellant to be acquitted of count I.

The judgment is affirmed.

White, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied June 15, 1959, and appellant's petition for a hearing by the Supreme Court was denied July 15, 1959.