[Crim. No. 12608. Second Dist., Div. Four. Aug. 25, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. CHARLES HINMAN, Defendant and Appellant.

Laughlin E. Waters, under appointment by the Court of Appeal, and H. Gary Knight, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.

KINGSLEY, J.—Defendant was charged in five counts with soliciting Leonard Amabile to commit the crime of murder, each count charging a solicitation on a different date. A motion to dismiss, under section 995 of the Penal Code, was

denied; defendant pled not guilty. After a trial by jury, he was found guilty on all five counts. A motion for a new trial was made and denied; probation was denied; he was sentenced to state prison on count I, no sentence being imposed on the other four counts. Defendant has appealed.

I

 We consider, first, the contention that the trial court had lost jurisdiction to try defendant in the present proceeding because he was improperly denied bail for a five-day period from the time of his arrest until the morning of the preliminary examination. This contention was raised by proceedings prior to the preliminary examination, at that examination, on the motion under section 995, at the opening of the trial, and on the motion for new trial. It cannot be said that it was waived.[1]

Since defendant was charged with a violation of section 653f of the Penal Code—a noncapital offense—he was entitled to bail as of right (Cal. Const., art. I, § 6) and the denial for the five-day period was error. Assuming, without deciding, that there is an "implied exception" to the constitutional requirement for bail, the mere opinion of the arresting officer and the deputy district attorney afford even less excuse for the denial here than was held insufficient in *In re Keddy* (1951) 105 Cal.App.2d 215 [233 P.2d 159]. But the denial of bail pending the preliminary examination does not affect the jurisdiction of the magistrate to proceed with that hearing. Appellant relies on two cases—*People* v. *Elliot* (1960) 54 Cal.2d 498 [6 Cal.Rptr. 753, 354 P.2d 225] and *People* v. *Napthaly* (1895) 105 Cal. 641 [39 P. 29]. But in both of those cases, as in *People* v. *Robinson* (1963) 222 Cal.App.2d 602 [35 Cal.Rptr. 344], and similar cases, the right infringed was one concerning the conduct of the preliminary examination itself. While counsel argued below, and argues here, that defendant might have been handicapped in preparation for the preliminary hearing by the fact of his incarceration, no showing has been made to us of any facts supporting that hypothesis, nor did his experienced counsel seek to have the preliminary examination continued after defendant was released on bail a few hours before the preliminary examination was to begin.

---

[1] In order to avoid repetition, we note here that each of the contentions relied on for reversal of the judgment were properly raised in the trial court and were argued there both extensively and exhaustively. It is not, and could not, be urged that trial counsel had failed to perfect their record.

We conclude that the magistrate had jurisdiction to hold the preliminary examination and that defendant cannot validly attack the information on the ground now under consideration.

## II

■ By the express terms of section 653f of the Penal Code, in order to sustain a conviction thereunder, the "offense must be proved by the testimony of two witnesses, or of one witness and corroborating circumstances." The case for the People rested on the oral testimony of Amabile as to seven separate conversations with defendant and the record of three taped conversations—two between defendant and Amabile and one between defendant and the arresting officers after defendant's arrest. Unless the record of these latter conversations was admissible, the requirement of corroboration was not met.[2] Therefore, we turn next to the objections to their admissibility.

A substantial portion of the reporter's transcript is devoted to discussions in chambers over the procedure by which these records, if admissible at all, were to be presented to the jury. The prosecution presented the original tapes of the conversations, and transcriptions made from those tapes, for identification. It is not questioned that a sufficient foundation was laid insofar as identification was concerned. The trial court, in chambers, heard the tapes played[3] and checked the three transcripts against the tapes. It made a preliminary ruling that the tapes were sufficiently intelligible and that the transcripts accurately reflected the sounds on the several tapes. The transcripts were read to the jury as part of the prosecution's case. Thereafter, the defense had the tapes themselves played to the jury.[4] Counsel were permitted to, and did, argue to the jury

[2]In argument to the jury, the prosecuting attorney suggested that there was additional corroboration in the fact that Amabile turned over to the sheriff's officers several hundred dollars which he testified had been given to him by defendant. But, without the recordings of the conversations, the mere fact that Amabile had, and turned over, the money in question, established no connection with defendant.

[3]Actually, the court heard the tapes of the conversations between defendant and Amabile. Counsel (with defendant present and concurring) then stipulated that it could be deemed that the court had heard the third tape and that it had made the same preliminary ruling as in the case of the first two. It is conceded that this deviation from procedure did not affect any rights of defendant.

[4]Since the content of the tapes had already been read to the jury, obviously defendant did not waive any of his rights to object to their introduction by having them played to the jury.

that the tapes contained so much unintelligible material as to make the intelligible portions statements made out of context and therefore insufficient to constitute the required corroboration.[5] We can see no procedural error in the admission of either the tapes or the transcripts.

It is, however, argued that the recorded conversations were inadmissible on the grounds (1) that they were obtained in violation of the rules laid down in *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361];[6] (2) that the tapes were obtained in violation of the rights of defendant under the Fourth Amendment; and (3) that they were obtained in violation of section 605 of the Federal Communications Act.

■ The argument based on *Dorado* is without merit. The conversations reflected on the first two tapes took place prior to defendant's arrest and the first even prior to the time when the case had passed beyond the investigatory stage;[7] it is now settled that the *Dorado* rules do not apply until the defendant is in custody. (*Ballard* v. *Superior Court* (1966) 64 Cal.2d 159 [49 Cal.Rptr. 302, 410 P.2d 838].) The third conversation took place after defendant had been arrested, on a warrant, but only after the warnings prescribed by *Dorado* had been given.[8]

■ The second objection to the use of the recordations is that they were obtained in violation of defendant's basic right of privacy, as protected by the Second, Fourth, Fifth and Fourteenth Amendments.

As to the third tape, containing defendant's conversation with the arresting officers, the argument seems to us to be totally fallacious. Certainly defendant did not regard that conversation as in any way confidential, no invasion of his

---

[5]While the argument as to the intelligibility, meaning and effect of the tapes was legitimate, the jury was not required to accept it and its verdicts indicate that it did not. If admissible at all, the records of the conversations clearly permitted a finding that Amabile's direct testimony had sufficiently been corroborated.

[6]Since the trial was held in April and May of 1966, the rules laid down by *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] were not applicable. (*People* v. *Rollins* (1967) 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221].)

[7]At that time, the officers had only Amabile's unsupported story concerning his earlier conversations with defendant. The trial court was entitled to accept the contention that the first tape was made as much to clear defendant as to implicate him.

[8]It is not contended that defendant did not understand the warnings **given.**

home (lawful or otherwise) was involved[9] and defendant had already been warned that anything he said could be used against him in court. That the officers chose to record his statements on tape rather than in a notebook or in their memories affords defendant no ground for complaint.

As to the first two tapes and the recordations made of the conversations recorded thereon, defendant's contention is answered by the holding in *Lopez* v. *United States* (1963) 373 U.S. 427 [10 L.Ed.2d 462, 83 S.Ct. 1381], and by the more recent holdings in *Hoffa* v. *United States* (1966) 385 U.S. 293 [17 L.Ed.2d 374, 87 S.Ct. 408], in *Lewis* v. *United States* (1966) 385 U.S. 206 [17 L.Ed.2d 312, 87 S.Ct. 424], and in *Osborn* v. *United States* (1966) 385 U.S. 323 [17 L.Ed.2d 394, 87 S.Ct. 429].

*Lopez* is on all fours with the case at bench. A government agent had entered defendant's office, at defendant's invitation, ostensibly to discuss the payment of a bribe. The agent had no intention of being bribed; and he carried a concealed device whereby the conversation was recorded. In an opinion by Mr. Justice Harlan, the court said: ''Davis [the agent] was not guilty of an unlawful invasion of petitioner's office simply because his apparent willingness to accept a bribe was not real. [Citation.] He was in the office with petitioner's consent, and while there he did not violate the privacy of the office by seizing something surreptitiously without petitioner's knowledge. [Citation.] The only evidence obtained consisted of statements made by Lopez to Davis, statements which Lopez knew full well could be used against him by Davis if he wished. We decline to hold that whenever an offer of a bribe is made in private, and the offeree does not intend to accept, that offer is a constitutionally protected communication.

'' . . . .

'' . . . this case involved no 'eavesdropping' whatever in any proper sense of that term. The Government did not use an electronic device to listen in on conversations it could not otherwise have heard. Instead, the device was used only to obtain the most reliable evidence possible of a conversation in which the Government's own agent was a participant and which that agent was fully entitled to disclose. And the device was not planted by means of an unlawful physical invasion of petitioner's premises under circumstances which would violate the Fourth Amendment. It was carried in and out by an

---

[9]The tape starts with the arrest, apparently at defendant's home; but the statements relied on by the prosecution were made in the police car, enroute to the sheriff's station.

agent who was there with petitioner's assent, and it neither saw nor heard more than the agent himself.

"' . . . .

"Stripped to its essentials, petitioner's argument amounts to saying that he has a constitutional right to rely on possible flaws in the agent's memory, or to challenge the agent's credibility without being beset by corroborating evidence that is not susceptible of impeachment. For no other argument can justify excluding an accurate version of a conversation that the agent could testify to from memory. We think the risk that petitioner took in offering a bribe to Davis fairly included the risk that the offer would be accurately reproduced in court, whether by faultless memory or mechanical recording." (*Lopez* v. *United States* (1963) 373 U.S. 427, 438-439 [10 L.Ed.2d 462, 470-471, 83 S.Ct. 1381, 1387].) The language just quoted is as applicable to the case at bench as it was in *Lopez*, the language and holdings in the three more recent cases is to the same effect.

■ However, it is argued that *Lopez* and the later cases did not involve the use of a radio transmitting device, but merely of a self-contained recorder, so that the conversation was not, by any definition, "intercepted." It is on this distinction that defendant invokes section 605 of the Federal Communications Act.[10] The same contention was made, and rejected in *On Lee* v. *United States* (1951) 343 U.S. 747 [96 L.Ed. 1270, 72 S.Ct. 967]. While that case is severely criticized by Mr. Justice Brennan in his dissent in *Lopez* and less severely commented on by Mr. Chief Justice Warren in his concurring opinion in that case,[11] still it remains the last expression by the Supreme Court on the matter. Of necessity, we follow it here.[12]

---

[10]The statutory language relied on is as follows: ". . . no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect or meaning of such intercepted communication to any person."

[11]The Chief Justice's objections to *On Lee* are not applicable to the case at bench. His concern is expressed in the following passage from his concurring opinion in *Lopez*: "The use and purpose of the transmitter in *On Lee* was substantially different from the use of the recorder here [in *Lopez*]. Its advantage was not to corroborate the testimony of Chin Poy, but rather, to obviate the need to put him on the stand." (373 U.S. 427, 443 [10 L.Ed.2d 462, 473, 83 S.Ct. 1381, 1390].) As we have pointed out, in the present case, unlike *On Lee*, the government agent was called to testify, so that he was open to cross-examination and to impeachment, and the recording was used to corroborate the agent's testimony and not as a substitute for it.

[12]At oral argument, counsel urged on us the recent decision in *Berger* v. *New York*, 388 U.S. 41 [18 L.Ed.2d 1040, 87 S.Ct. 1873]. But that

## III

 Defendant argues that he could not have had the intent necessary for conviction because he knew, when he made the alleged solicitations, that the intended victim was outside the continental United States and, thus, that the crime allegedly solicited was impossible of commission. The same argument was made to the jury: obviously they rejected it. Their action cannot be upset here. It is true that defendant testified that he knew the victim was outside the continental United States at least a week before his first conversation with Amabile. But defendant was quite vague as to exactly when or how he secured that information and the jury was quite justified in concluding that defendant did not know of the victim's absence until he was told of it by Amabile during their seventh conversation. That conversation included the information that the victim was expected back the following day and exhortations by defendant to Amabile to carry out the killing, no matter how long it took. The conclusion that defendant was in earnest in soliciting the killing was legitimate.

## IV

 Defendant next contends that the trial court improperly refused to instruct the jury, in accordance with subdivision 4 of section 2061 of the Code of Civil Procedure, that "evidence of an oral admission of the defendant ought to be viewed with caution." The same contention was made and rejected in *People* v. *Hines* (1964) 61 Cal.2d 164, 173 [37 Cal.Rptr. 622, 390 P.2d 398], where the court said: "Nor did the court err in failing to instruct upon its own motion that the jury should view with caution oral admissions of defendant. The rule advocated by defendant, found in section 2061, subdivision 4, of the Code of Civil Procedure, has been held to be inapplicable to tape-recorded statements, which is the type of admission presented here. (*People* v. *Gardner* (1961) 195 Cal.App.2d 829, 832 et seq. [16 Cal.Rptr. 256].)"

Acknowledging the existence of that authority, counsel argues that tape recordings are susceptible of alteration and that this fact makes them as much subject to suspicion as oral testimony dependent on memory. Whatever merit there may

---

case, as we read it, in no way overrules *Lopez.* The "eavesdropping" involved in *Berger* was accomplished by means of a trespassory entry into protected premises, unlawful unless the trespass was made lawful by virtue of the New York statute relied on by the prosecution. The opinion, which cites and distinguishes both *Lopez* and *Osborn,* is directed to the validity of that statute and not to the kind of entry herein involved.

be in this argument, we have no power to disregard the ruling by the Supreme Court.

In addition, no prejudice could have resulted in the case at bench. As we have said, counsel argued extensively that the tapes were unintelligible and uncertain. The cautionary instruction could have added nothing to the argument made to them.

V

■ Defendant contends that the trial court permitted improper questions on the cross-examination of one of his character witnesses. The witness had testified, on direct examination, that defendant's reputation in the community "as being a law-abiding citizen, as being a peaceable man," was good. On cross-examination, after questions designed to test the witness' knowledge of any community reputation, he was then asked as follows:

"Q. Had you heard, Mr. Ecklin, that approximately four years ago this defendant, whose reputation you testified to, was convicted by the Malibu Justice Court for failing to comply with the fire hazard laws in the Malibu area? Had you heard that? A. No. I hadn't.

"Q. Had you heard, Mr. Ecklin, that this defendant was arrested on January 10, 1964, for the crime of battery by the Los Angeles Police Department? Had you heard that? A. No.

"Q. All right. Had you heard, Mr. Ecklin, that this defendant was found in contempt of Court on July 22, 1963, and sentenced to five days in the County Jail? Had you heard that? A. Not that I can recall right now.

"Q. All right. Had you heard, Mr. Ecklin, that this defendant, on July 23, 1964, was once again found in contempt of Court and sentenced to ten days in the County Jail? Had you heard that? A. No. sir.

"Q. And had you heard that on December 7, 1965, once again, Mr. Hinman was found in contempt of Court and sentenced to fifteen days in the County Jail? A. No.

"Q. All right. Now, if you had heard those reports, Mr. Ecklin, would your opinion as to those specific traits of this defendant for that reputation, would your opinion change?

"Mr. Warner: Object to that upon the ground it is argumentative. It calls for the conclusion of the witness.

"Mr. Hecht: The California Supreme Court says that is a perfectly proper question.

"THE COURT: Objection overruled.

" (The pending question was read by the reporter.)

"THE WITNESS: Well, not knowing the conditions there, I couldn't say that it would. I mean, you never know, see?"

It is not contended that the offenses had not occurred. Clearly, they were offenses that related to the very aspects of character involved in the direct testimony—one involved an offense of violence, the others were directed to the character of being "law-abiding." The questions were proper. (*Chronicle Publishing Co.* v. *Superior Court* (1960) 54 Cal.2d 548, 560-561 [7 Cal.Rptr. 109, 354 P.2d 637]; *People* v. *McKenna* (1938) 11 Cal.2d 327, 335-336 [79 P.2d 1065]; *People* v. *Cooley* (1962) 211 Cal.App.2d 173, 212 [27 Cal.Rptr. 543].)

## VI

Defendant contends that the trial court improperly refused to instruct the jury on the theory of diminished mental capacity.[13]

To understand the contention thus made requires a fuller exploration of the background of the case. Defendant had been engaged for several years in a bitterly contested divorce proceeding. He contended that his wife had deserted him and gone to live with another man, by whom she had had a child. He felt quite strongly that the wife had been given an unjust property determination as well as an unjust alimony and attorney fee award. He expressed great ambivalence in his feelings about his wife and very strong feelings of hostility toward her attorneys.[14]

At the time of defendant's first conversation with Amabile, defendant was living in a house in Beaumont, Riverside County, California, next door to the house occupied by his wife and the other man. Amabile, a crew chief for a group of magazine sales people, had come to defendant's home, after having earlier visited the home of Mrs. Hinman. Defendant engaged him in conversation, telling Amabile his domestic troubles, and especially his grievances against the attorney, Murray Chotiner. Amabile remarked: "If he is giving you that much trouble, why don't you kill him." After further conversation, defendant offered to pay Amabile $500 to kill Chotiner. Amabile accepted. The subsequent conversations, one in Beaumont and five in Los Angeles County, were con-

---

[13]Defendant requested CALJIC No. 73-B.

[14]For part of the history of that litigation, consult: *In re Hinman* (1966) 239 Cal.App.2d 845 [49 Cal.Rptr. 162].

cerned with working out the details of the proposed killing and the financial details of the payment. As we have above discussed, the last two of the Los Angeles County conversations were recorded on tape.

As far as we can discover, defendant never seriously denied that he had made the offer of payment to Amabile as alleged, although he did insist that, because parts of the recorded tapes were unintelligible, the recorded portions of those two conversations were out of context and did not truly represent his feelings or real intentions. Amabile's contention (which the jury apparently accepted) was that he had never intended to kill Chotiner, but that he was a mere feigned accomplice, intending to get as much money from Hinman as he could and then to leave town; that, after five conversations, he had become afraid that Hinman would hire another killer when he discovered he had been tricked by Amabile, and therefore had reported the scheme to Mrs. Hinman and to the Los Angeles sheriff's office; and that he had carried on the last two conversations at the direction of the sheriff's officers in order to give them corroboration of his story.

In his testimony at the trial, Hinman claimed that he had been suspicious of Amabile from the first; that he thought Amabile some kind of a tool of Mrs. Hinman and Chotiner; that he had gone along with the purported plan in order to see how far the plotters against him would go; and that he had thought that, if Amabile reported back to Mrs. Hinman the plan to kill Chotiner, Mrs. Hinman might be induced to return to him or, at the least, to reduce her monetary demands. He testified that, because he regarded Amabile as an agent of Mrs. Hinman and Mr. Chotiner, he never regarded his purported offer to Amabile as a serious contractual offer and that he had paid Amabile money as a device to keep open what he regarded as an avenue of communication with his wife.

This contention, which went to the element of intent to solicit, was presented to the jury by defendant's testimony, and was argued to them by trial counsel; they were properly instructed on it; obviously the jury did not accept it.

But counsel also contended to the trial court, and it is argued here, that, since the charge was of solicitation to murder, the People had the burden of proving a second intent—namely that the defendant intended that the crime to be committed by his solicitee be that of murder—that proof of

908

that intent involved proof of malice and that the existence of malice can be negated by evidence of mental disorder (short of defensive insanity) of the type considered in *People* v. *Conley* (1966) 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911] ; *People* v. *Gorshen* (1959) 51 Cal.2d 716 [336 P.2d 492], and *People* v. *Wells* (1949) 33 Cal.2d 330 [202 P.2d 53].

It is not contended that defendant was intoxicated during any of the several conversations, nor that he was in a state of unconsciousness, and no expert testimony as to his mental condition was offered. The contention is based on the argument that the rambling nature of his recorded conversations and of his testimony at the trial showed that he was incapable of the "malice" that is included in the definition of murder under section 187 of the Penal Code. It would unduly extend this opinion to set out the statements of defendant relied on in this argument. We have read both the transcriptions of the tapes and the trial testimony. We conclude that it does not show the factual basis for the legal contention made. We would agree that defendant did not have a fully normal attitude toward either his wife or her attorney. It is also clear that, like many other husbands, his attitude toward an erring young wife swung from rage to forgiveness. But, once we assume (as the verdict requires us to do), that defendant was not merely leading Amabile on, it is quite clear that he had, toward Chotiner, the very "malice" that is classic in any definition of murder and that he carefully and with deliberation planned with Amabile the minutest details of the proposed killing. The most that could be said for defendant would be that he was in a mental condition comparable to that of the defendant in *People* v. *Wolff* (1964) 61 Cal.2d 795 [40 Cal.Rptr. 271, 394 P.2d 959]. But Wolff was held to be guilty of murder, although in the second degree. But the incapacity to "maturely and meaningfully reflect upon the gravity of the contemplated act"[15]—which is the best that defendant here could claim—does not mean that, as part of the immature reflection, a defendant cannot enlist the aid of others in his plans. It follows that, assuming but not necessarily accepting, defendant's legal theory, the record did not contain evidence that made the requested instruction applicable.

VII

As we pointed out above, the original contact between defendant and Amabile was in Riverside County. That

[15]*People* v. *Wolff* (1964) 61 Cal.2d 795, 821 [40 Cal.Rptr. 271, 394 P.2d 959].

original conversation was followed by another in Riverside County and by five in Los Angeles County. Clearly, no matter which conversation be regarded as constituting a "solicitation," it was proper to lay venue in Los Angeles, since acts "requisite to the achievement or end of the unlawful purpose occurred" in Los Angeles within the meaning of section 781 of the Penal Code. The acts of defendant in completing arrangements for payment and in arranging the details of the proposed homicide, all done in Los Angeles County were of the same nature as those held sufficient for the purpose of venue in *People* v. *Megladdery* (1940) 40 Cal.App.2d 748 [106 P.2d 84].

The difficulty arises out of the fact that the information did not charge a solicitation in Riverside County on the first occasion, with allegations showing venue in Los Angeles but, instead, charged five solicitations in Los Angeles County on dates subsequent to the original Riverside conversation. Again, the facts of this case are similar to those in *Megladdery*. In both cases, acts done in another county were sufficient to constitute a completed act of solicitation. (See *People* v. *Shapiro* (1959) 170 Cal.App.2d 468 [338 P.2d 963].) In both cases, the solicitation was renewed, and details looking toward its consummation were arranged, in the county of trial. In both cases, the information charged the offense as occurring in the county of trial. The holding in *Megladdery*, which sent the case back for trial in the same county on that information, necessarily approves the same kind of pleading in the case at bench.

The judgment is affirmed.

Files, P. J., and Jefferson, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 19, 1967.