270 Cal.App.2d 575 (1969)
THE PEOPLE, Plaintiff and Respondent,
v.
MARIO CARL AMATA et al., Defendants and Appellants.
Crim. No. 7203. 
California Court of Appeals. First Dist., Div. Three. 
Mar. 11, 1969.
 Frank T. Jolly and Toff, Gordon & Royce, under appointment by the Court of Appeal, for Defendants and Appellants.
 Thomas C. Lynch, Attorney General, Robert R. Granucci and Timothy G. Laddish, Deputy Attorneys General, for Plaintiff and Respondent.
 DAVID, J. pro tem. [fn. *]
 Appellants appeal their convictions and sentences, having been found guilty as charged in a four-count indictment filed in the Superior Court of Santa Clara County.
 Count one charged them with conspiracy (Pen. Code, 182) to violate Penal Code section 475 (possession of unfinished counterfeit travelers checks and money orders, with intent to complete and utter them) specifying 12 overt acts from August 1, 1967 through November 9, 1967.
 Count two charged them with violation of Penal Code section 475 (possession of unfinished counterfeit checks, with intent to complete and utter them) on or about November 5, 1967. *579
 Count three charged another such violation on or about November 8, 1967.
 Count four charged appellant Amata with a violation of Penal Code section 475a (possession of a completed check, with intention to pass the same) on or about November 5, 1967.
 Counts one and three also charged appellant Gilmore with being armed with a deadly weapon at the time of the offense charged; and count two as amended charged Gilmore with being armed with a concealed deadly weapon. The indictment also charged that all offenses were linked together in their commission.
 The appellants having been found guilty upon each count applicable to them by the jury were sentenced to state prison for the terms prescribed by law, the sentences to run concurrently. No sentence was imposed as to count one. (Cf. In re Romano, 64 Cal.2d 826 [51 Cal.Rptr. 910, 415 P.2d 798].) During the course of the proceedings, each appellant's motions for change of venue, and for dismissal of the case under Penal Code section 995 were denied; and motions of Amata and Elliott for reduction of bail were denied. Appellants' motions for new trial likewise were denied.
 Appellants claim, "Surely, it was clearly proved that the reason the Appellants had the checks in their possession at the time of the arrest was to effect a sale to a buyer of counterfeit checks"; that consequently, the evidence failed to show possession of travelers checks with intent to defraud; that their arrests and convictions were the result of entrapment, and also, that the trial court erred in not giving one of several instructions tendered relative to entrapment, concerning burden of proof; that a tape recording of a conversation between an appellant and Richards, as prosecuting witness, was "wiretap" evidence, received in evidence to appellants' prejudice; that this was inadmissible, though secured by a private investigator, without the warnings appropriate under Massiah v. United States, 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199]; that their trial was not fair, due to "unsupported and prejudicial statements" made in the public press; and hence, their convictions were contrary to due process of law; that the bail for appellants was excessive, depriving them of their rights under the Eighth and Fourteenth Amendments to the United States Constitution; that the grand jury indictment was defective, since allegedly based on testimony contrary to that given on the trial; that there was *580 prejudicial misconduct of the district attorney in producing two crates of counterfeit Bank of America travelers checks in the courtroom, which could have prejudiced the jury, though the same were not admitted in evidence; and that there was a denial of due process of law, because allegedly, the prosecution failed "to bring forth all of the evidence."
 Finally, it is claimed that appellants' joint trial for conspiracy under Penal Code sections 182 and 1098 constitutes a denial of due process of law and requires reversal.
 In October 1967, in the course of another investigation for the Bank of America, Irving J. Richards, employee of a firm of private investigators, was introduced to one Pedro Torres, in Miami, Florida, by an informant Kaufman. Torres told Richards he was in charge of a counterfeit travelers check operation, and could get him counterfeit Bank of America travelers checks at 22 cents on the dollar. At this time $50 counterfeit checks of the bank were being distributed about the United States.
 When advised of this offer, the bank retained Richards to investigate. Richards thereupon instructed Kaufman in Miami to get samples of the counterfeits from Torres. Kaufman, in Miami, told Torres' son he wanted to reach Torres. The reply to Kaufman was a call to him from Arizona by Elliott, who gave him a telephone number, which Kaufman relayed to Richards.
 Thereafter, there followed a series of telephone conversations between Richards, using the name of Danny Bello, and Elliott, who had responded to Kaufman's attempt to contact Torres. Elliott met Richards at the San Francisco airport, stating they had available stolen American Express checks, and some $2,000,000 to $2,500,000 in counterfeit Bank of America travelers checks available to Richards and his "Mexican syndicate" for 20 percent to 25 percent of face value. Richards, at the instance of Elliott, went to Cleveland, met Gilmore, heard discussions with Amata. Richards was given samples of the counterfeits. Still posing as a potential purchaser, Richards was told he would have to purchase $50,000 face of the counterfeits before the big deal came off. Then Elliott and Amata on air fare advanced by the bank came to San Jose to verify Richards' ability to pay for the million dollar deal. Sergeant Hernandez of the San Jose police, posing as a member of the Mexican syndicate, took them to a safe deposit box where a large sum of money was exhibited to them. Other samples of the counterfeits were left *581 with Richards. Amata returned to Cleveland with the $50,000 face value of the counterfeits in an attache case. He stated there was no deal unless Richards bought these first, since the printer needed the money to produce the larger amount. A compromise deal was made whereby for $60,000, the $50,000 of counterfeits plus the negative and plates would be sold to Richards. The series of negotiations were related on the trial, primarily in respect to count one for conspiracy. It is to be noted that other counts of the indictment related to appellants' possession, completion and negotiation of counterfeit travelers checks for air transportation, at an eating house and at the San Jose Inn.
 On the evening of November 8, 1967, the appellants were apprehended at the San Jose airport with the $50,000 face value of counterfeits, and the negative and plates for producing the Bank of America counterfeits. Gilmore when arrested carried a loaded .25 caliber revolver in a pocket inside his waistband.
 Indictment followed.
 [1] As in all appeals, that evidence which supports the verdicts and sentences is accepted, and the contrary evidence, if any, is rejected. (People v. Estrada, 211 Cal.App.2d 722, 724 [27 Cal.Rptr. 605].)
 [2] At the outset, the contention that the grand jury indictment was defective because of a variance with the ultimate proof is untenable. The evidence upon the trial sustained the indictment. We find in the record facts which demonstrated reasonable and probable cause. The trial court properly denied appellants' motion under Penal Code section 995. (People v. Williams, 27 Cal.2d 220, 226 [163 P.2d 692].)
 [3] It was not established that Richards or officers of the law generated in the appellants their original intent to commit criminal acts which they would not have committed but for such inducement. The accused only acted on their pre-existing criminal intent, and the defense of entrapment fails. (People v. Benford, 53 Cal.2d 1, 10 [345 P.2d 928]; People v. Sweet, 257 Cal.App.2d 167, 170 [65 Cal.Rptr. 31].)
 [4a] The evidence here does not show any seduction of innocent people into a criminal act or career by officers of the law or by the bank's investigator.
 Even should defendants' uncontradicted testimony have tended to show that they reluctantly were induced to act by repeated requests, gestures of friendship, or appeals to sympathy, the triers of fact were not bound to believe it, nor is an *582 appellate court required to reappraise its effect. (People v. Benford, supra, 53 Cal.2d 1; People v. Beem, 192 Cal.App.2d 207, 211 [13 Cal.Rptr. 238]; People v. Moreno, 237 Cal.App.2d 602, 605 [47 Cal.Rptr. 287].)
 Solicitation by a decoy to procure the counterfeit travelers checks is not entrapment as defined in criminal law. (People v. Makovsky, 3 Cal.2d 366 [44 P.2d 536], with some factual similarities to the present case.)
 [5] The employment of stratagems for the purpose of apprehending persons already engaged in criminal activities is not entrapment, even though police officers participate in them. (People v. Schwartz, 109 Cal.App.2d 450, 454 [240 P.2d 1024]; People v. Burnett, 204 Cal.App.2d 453, 456 [22 Cal.Rptr. 320].)
 Appellants would have been equally guilty of the violations charged, even if "Danny" and "Eddy" had in fact been what they pretended to be. (Cf. United Liquors, Inc. v. Department of Alcoholic Beverage Control, 218 Cal.App.2d 450, 455 [32 Cal.Rptr. 603].)
 [4b] The negotiations established that appellants in fact could produce a stock of counterfeit travelers checks. From the standpoint of the bank, the offer to purchase $2,000,000 of such counterfeit checks was no doubt an attempt to discover the extent of appellants' counterfeiting operations, to perhaps retire the entire stock from potential circulation, and likewise to get the negative and plates out of circulation. This offer, no doubt, served as a stratagem for such purposes. In fact, it did not induce appellants to produce more than the counterfeits with face value of $50,000. We cannot conclude that the offer to purchase $2,000,000 worth was an inducement constituting entrapment as a matter of law.
 [6] The trial judge properly refused to instruct to the effect that after some evidence on the issue of entrapment has been brought forward, the People have the burden of proving beyond a reasonable doubt that there was pre-existing intent on the part of appellants. The defendants had the burden of proving their affirmative defense of entrapment by a preponderance of the evidence. (People v. Valverde, 246 Cal.App.2d 318, 325-326 [54 Cal.Rptr. 528].)
 [7] In the trial court, appellants did not assert any claim that their rights under the Fourth Amendment to the United States Constitution were violated by use of the tape recordings in evidence. Even if the claim were meritorious, the law is clear that the appellants cannot raise the objection for the *583 first time on appeal. (People v. Alvarado, 250 Cal.App.2d 584, 589 [58 Cal.Rptr. 822]; People v. Hyde, 51 Cal.2d 152, 157 [331 P.2d 42]; Robison v. Superior Court, 49 Cal.2d 186, 187 [316 P.2d 1].)
 [8] Even though an objection had been raised upon other Fifth and Sixth Amendment grounds (Evid. Code, 353; People v. Flores, 68 Cal.2d 563, 567 [68 Cal.Rptr. 161, 440 P.2d 233]) the objection still would not be meritorious. All the tape recordings were made with the knowledge and consent of Richards, who was a party to each recorded conversation. (People v. Johnson, 249 Cal.App.2d 425, 429 [57 Cal.Rptr. 480]; Lopez v. United States, 373 U.S. 427, 437-439 [10 L.Ed.2d 462, 469-470, 83 S.Ct. 1381]; Dryden v. United States, 391 F.2d 214, 215; People v. Ragen, 262 Cal.App.2d 392, 397-399 [68 Cal.Rptr. 700]; People v. Jones, 254 Cal.App.2d 200, 220 [62 Cal.Rptr. 304]; People v. Hinman, 253 Cal.App.2d 896, 901-903 [61 Cal.Rptr. 609].)
 Richards first became convinced that appellants were guilty of a felony when they handed him a counterfeit check on or about October 29, 1967, which he turned over to the police department. Richards' conversations with appellants thereafter were recorded. No constitutional warnings were given appellants. The San Jose police loaned Richards the tape recorder. The recordings he made of his conversations with appellants after October 29 were monitored by the San Jose police and the F.B.I. But the tapes were offered in evidence by appellants' counsel, no doubt in elaboration of the entrapment defense. Appellants thus cannot complain, nor could they had they not played the tapes in their defense.
 [9] Appellants' claim that at the time of their arrest they were not given a warning as prescribed by Miranda v. Arizona, 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] is not supported by any reference to the record. Appellants were not under any custodial restraint until they were formally arrested. (People v. Lee, 249 Cal.App.2d 234, 245 [57 Cal.Rptr. 281].) A statement of Gilmore made one day after his arrest was received into evidence, after a showing that he was fully advised of his rights, which he freely and voluntarily waived.
 Statements voluntarily made by the appellants in the tape recorded conversations concerned do not require application of the rules of Miranda v. Arizona, supra, 384 U.S. 436. The conversations were not with a peace officer; there were no compulsions actually or latently involved in any custodial *584 interrogation, nor was there any ground for belief there was such deprivation. (People v. Arnold, 66 Cal.2d 438, 448 [58 Cal.Rptr. 115, 426 P.2d 515]; Ballard v. Superior Court, 64 Cal.2d 159, 168 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416]; People v. Ing, 65 Cal.2d 603, 612-613 [55 Cal.Rptr. 902, 422 P.2d 590].)
 But appellants contend that their right to counsel was subverted when Richards, posing as their confederate, secured the tape recordings and quoted their incriminating testimony, relying upon Massiah v. United States, supra, 377 U.S. 201.
 In Hoffa v. United States, 385 U.S. 293, 302 [17 L.Ed.2d 374, 382, 87 S.Ct. 408], the court stated "Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." (Cf. Rathbun v. United States, 355 U.S. 107, 110 [2 L.Ed.2d 134, 137, 78 S.Ct. 161], content divulged by one party does not violate 47 U.S.C. 605 prohibiting wire tapping.)
 "Massiah v. United States, 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246] is not in point. There the defendant had been indicted and he had a lawyer. The objectionable evidence was obtained by the government through an informer by trickery." (Amsler v. United States, 381 F.2d 37, 48.) The federal cases generally emphasize that post indictment statements were concerned in Massiah. (Cf. United States v. Smith, 379 F.2d 628, 632; White v. United States, 394 F.2d 49, 57; People v. Varnum, 66 Cal.2d 808, 813, note 1 [59 Cal.Rptr. 108, 427 P.2d 772]; People v. Wright, 245 Cal.App.2d 265, 269 [53 Cal.Rptr. 844].)
 In United States v. Knohl, 379 F.2d 427, 442-443, the court stated that by Hoffa v. United States, supra, 385 U.S. 293, it was abundantly clear that the United States Supreme Court did not invalidate tape-recorded evidence, secured in the pre-accusatory or custody stage, for failure to apply the rules promulgated in Miranda v. Arizona, supra, 384 U.S. 436, Escobedo v. Illinois, 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], or in Massiah v. United States, supra, 377 U.S. 201.
 [10] Bail was set at $62,500 for each appellant (according to appellants' brief); reduction was denied. There was no prejudicial error in this regard.
 In view of the nature and scope of their operations, we cannot, on appeal, declare that the $62,500 bail set for each appellant was excessive, and hence unconstitutional. (Cal. *585 Const., art. I, 6; U. S. Const., Amend. 8; Cal. Pen. Code, 1275.) Appellants make the startling claim that if a lower amount had been specified "they would have been able to obtain evidence and testimony of witnesses not brought forth which evidence and testimony would have shown their innocence." In fact, appellant Gilmore was free on bail for three or four weeks before the trial. No showing has been made that the amount of bail required probably affected the outcome of the trial. (People v. Norman, 252 Cal.App.2d 381, 394-399 [60 Cal.Rptr. 609]; People v. Hinman, supra, 253 Cal.App.2d 896, 899.)
 There were four counts to the indictment, count one for conspiracy charging 12 overt acts; all counts charging Gilmore with being armed with a deadly weapon, or concealed weapon.
 An interstate counterfeiting ring was involved; talking about the production and sale of $2,000,000 in spurious travelers checks and similar sidelines. At least one of the principals involved was Torres, still at large. That some such person might post bail to permit the confederates to escape, would not be an unreasonable conjecture.
 Appellants claim that Helen Carlson, desk clerk at the San Jose Inn, knew that the travelers check she cashed was counterfeit, and hence the Inn was not defrauded. Whether she was forewarned or not that appellants might attempt to pass counterfeits, the intent of the appellants was to defraud by passing the counterfeit travelers check. (Pen. Code, 475.) There is no showing, as appellants claim, that the prosecution deliberately suppressed material evidence. (In re Lessard, 62 Cal.2d 497, 508 [42 Cal.Rptr. 583, 399 P.2d 39].)
 [11] Claiming prejudicial error, appellants assert the district attorney had two large crates of counterfeit Bank of America checks brought into the courtroom and kept in plain sight during the trial, leading jurors to infer that appellants were responsible for making and circulating those several cubic feet of counterfeit checks in addition to those received in evidence.
 These checks were offered in evidence by the People. The district attorney, out of the presence of the jury, offered to prove that they were prepared from the negatives in possession of appellants at the time of their arrest. The court sustained appellants' objection. While there was evidence in the record that the counterfeits were produced from the same *586 plates, the court held there was no evidence that appellants printed them.
 Whether this evidence was admissible (People v. Weiss, 50 Cal.2d 535, 565 [327 P.2d 527]) or not, no misconduct is shown. The district attorney could reasonably have believed these crates of counterfeits would be allowed into evidence. (People v. Hillery, 62 Cal.2d 692, 707-708 [44 Cal.Rptr. 30, 401 P.2d 382].) No special cautionary instruction was requested or denied respecting the rejected exhibits.
 [12] Not having asserted their claimed right to separate trials in the trial court, appellants cannot now seek reversal because they were tried jointly. (People v. Irvin, 264 Cal.App.2d 747, 764 [70 Cal.Rptr. 892]; People v. Isby, 30 Cal.2d 879, 897 [186 P.2d 405].) Such a joint trial is specifically authorized by Penal Code section 1098, which is constitutional. (People v. Burton, 91 Cal.App.2d 695 [205 P.2d 1065].) No conflict of interest was apparent to the trial court. Appellants not having moved for severance in the trial court nor requested separate counsel, there is no ruling for this court to review. (People v. Smith, 253 Cal.App.2d 299, 307 [61 Cal.Rptr. 457]; People v. Stadnick, 207 Cal.App.2d 767, 774 [25 Cal.Rptr. 30, 99 A.L.R.2d 766].) Appellants were not denied due process of law in this regard. (See also People v. Alvarado, 255 Cal.App.2d 285, 288 [62 Cal.Rptr. 891], holding proper the joinder of multiple defendants charged jointly with at least one offense, where there is an underlying set of common facts or common evidence.)
 [13] Appellants claim that "There is not one scintilla of evidence indicating that the appellants intended to defraud anyone with the checks;" that their only intent was to sell the counterfeit checks, plates, and negatives to agents of the Bank of America and the San Jose Police Department. The contention overlooks appellants' personal negotiation of counterfeits with the airlines, the San Jose Inn, and Fisherman's Grotto. These were the specific transactions embraced in the second, third and fourth counts of the indictment.
 [14] Complaint is made that during the trial, stories in the press were "prejudicial and inflammatory," which appellants claim denied them due process, under Sheppard v. Maxwell, 384 U.S. 333 [16 L.Ed.2d 600, 86 S.Ct. 1507]. No examples appear in the record before this court; nor do those appended as exhibits to appellants' opening brief appear to be editorially inflammatory or factually extravagant. The record does not indicate that any such publicity affected the *587 selection of an impartial jury, nor that it reached the jurymen during their deliberations. The asserted ground is therefore not tenable. (People v. Brown, 184 Cal.App.2d 588, 595 [7 Cal.Rptr. 717].)
 The judgments are affirmed.
 Draper, P. J., and Brown (H. C.), J., concurred.
NOTES
[fn. *] *. Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.