Filed 4/15/15  P. v. Levens CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KASSANDRA LEVENS,<br><br>    Defendant and Appellant. | B250023<br><br>(Los Angeles County<br>Super. Ct. No. BA398474) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Dennis Landin, Judge.  Affirmed.

Law Offices of Mark E. Overland, Mark E. Overland and Courtney Overland for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, David C. Cook and Pamela C. Hamanaka, Deputy Attorneys General for Plaintiff and Respondent.

_____

Appellant Kassandra Levens was convicted, following a jury trial, of one count of solicitation to commit a crime (assault by means likely to produce great bodily injury) in violation of Penal Code section 653f, subdivision (a).[1] The jury found appellant not guilty of solicitation to commit murder in violation of section 653f, subdivision (b). The trial court sentenced appellant to two years in county jail and awarded her 802 days of custody credit, resulting in appellant being released from jail on parole.

Appellant appeals from the judgment of conviction, contending the trial court erred in excluding evidence of self-defense and defense of others, failing to give a unanimity instruction, admitting character evidence and then instructing the jury on that evidence with CALCRIM No. 375, admitting the testimony of witness Sirenia Esteves and then instructing the jury on that evidence with CALCRIM No. 371, and failing to properly instruct the jury on the elements of solicitation. We affirm the judgment of conviction.

Concurrently with her opening brief on appeal, appellant filed a motion to vacate the judgment pursuant to section 1473.6. We deny the motion.

Facts

Appellant and Philip Levens (Philip) married and had their first child, A., in 2007. That same year, Philip bought a house in Marina Del Rey for $1.85 million and took out a life insurance policy for $2 million.[2] Appellant and Philip had a second child, L., in 2008. The couple had a dispute about L.'s name. Thereafter, the marriage was not a happy one.

Sirenia Esteves worked as a babysitter and housecleaner for the Levens family in 2010. Sometime between September and November 2010, appellant told Esteves she

---

[1]    All further statutory references are to the Penal Code unless otherwise specified.

[2]    Appellant contributed money toward the purchase of the house, but only Philip's name was on the escrow documents. Philip named appellant as the beneficiary of the life insurance policy. She was also the beneficiary of Philip's Writers Guild pension and life insurance policy.

wanted 100 percent custody of the children if she divorced Philip. She also wanted Philip to support her financially. Appellant offered Esteves money if she would testify that appellant was a victim of domestic violence, that Philip hit her, did not give her money and would not allow her to work. None of these things were true. Esteves said she was not for sale. Shortly thereafter, in early 2011, Esteves was fired. Philip fired Esteves because appellant told him Esteves slapped A. Appellant said she did not want anyone in the house.

In February 2012, appellant left home with the children and did not tell Philip where she was going or how long they would be gone. Philip spoke with appellant on her cell phone for the first few days, but she then broke off contact. Philip went to the police station and orally reported that appellant had taken their children, but did not file a written report. At some point, Philip learned from a lawyer that appellant had filed for divorce. Fourteen days after appellant left, Philip was reunited with his children when appellant brought them to a store parking lot.

Appellant told Philip that the court had awarded them 50-50 custody, and she thought they should give it another try so the children could have both parents in the same house. Appellant's divorce petition contained allegations of domestic abuse and also physical and sexual abuse of the children. Appellant said her attorney made it up. She sent him an e-mail stating that she recanted the allegations. She also recanted in court.

Appellant moved back into the house in March 2012. Philip had a list of financial matters he wanted appellant to take care of, including closing her "secret" bank accounts. Appellant did not comply, and the couple argued. Appellant went outside on the balcony and screamed for the police. Philip covered appellant's mouth with his hand. According to Philip, appellant bit his finger down to the bone. He pulled on her and they both fell over. He hit her in the head so that she would let go of his finger. He was then able to get his finger free. Philip left the house. At some point, the police became involved. However, both appellant and Philip told the police that they did not want to press charges.

3

In May 2012, appellant met Gary Mazel through a friend. Before meeting in person, they spoke and exchanged text messages. Appellant told Mazel that Philip was beating and raping her and molesting the children. Thereafter, they had a series of meetings. The meetings occurred in May, but the exact dates are not in the record.

The first meeting took place at the Equestrian Park in Malibu. At first, appellant wanted Mazel to find some "dirt" on Philip so that she could get full custody of the children. Mazel, who described himself as a person who "fixed things," agreed to look for "dirt."[3]

Mazel's next meeting with appellant took place in a parking lot near boats in Marina Del Rey. He told her that he could not find anything on Philip. Appellant wanted Mazel to plant heroin on Philip so that she could get the house and the children. She also wanted Mazel to break Philip's arms and legs. Appellant agreed to give Mazel half of the estate for his services.

A third meeting took place at Mazel's hotel room in Santa Monica. Appellant stated that he wanted Philip and his father, David Levens (David), hurt.

Mazel saw appellant a fourth time at night on a dock in Marina Del Rey. Appellant told Mazel she would give Mazel half of whatever she got in a divorce. Appellant said she did not have any cash, but she gave Mazel some jewelry and asked him to pawn it. At some point, she gave Mazel a check for $100 to open a checking account.

A number of text messages which appellant and Mazel exchanged during May 2012 were introduced at trial. On May 7, 2012, appellant sent Mazel a photo of Philip. On May 9, 2012, appellant sent a text to Mazel with a photograph of a painting and told him he could sell the painting and that appellant would use the money to escape to France.

On May 11, 2012, appellant sent a text to Mazel asking him to talk with Lynn Levy, who saw appellant the same night after appellant got "cracked in the jaw."

---

[3] Mazel stated that he had been a bodyguard and had extracted people from other countries who had been kidnapped.

4

Appellant said she feared Philip, his father, his brother, his "cronies," and neighbors. The next day, appellant sent Mazel a photograph of her right eye with the text, "This was a black eye from 2 months ago." Appellant said she was afraid to go to the police because of Philip's connections.

On May 19, 2012, appellant sent a text to Mazel which said Philip and his father were trying to antagonize her by playing violent television shows in front of the children, that her daughter was scared, and that Philip tried to force himself on her. She texted, "100 percent trust is needed when about to embark on such a critical undertaking. I need to trust someone now. My children and I live with a dangerously explosive man . . . ."

On May 22, 2012, appellant texted Mazel that when she was thinking about Mazel, Philip started screaming at the children, she became scared, and then Mazel called. Appellant texted, "He is so scary." Mazel also received texts from appellant with "lol" and, "Are you figuring out strategy for our business plan? It's really time to act." Mazel texted appellant, "Can I see you later?" Appellant texted back twice, "Um." Mazel texted back, "If you're scared, let me know?" Appellant texted back, "I'm scared" and then texted, "Will you be ready at 7:00," "Need to plan for children," and "Need to talk shop. Philip just told children I'm a fucking idiot and tried to take away keys to my car because I couldn't open garage door." A few minutes later, appellant texted, "I can't take it." Mazel texted back, "Can you still leave on May 23rd after midnight," and appellant texted back, "I'm coming" and "Just please figure a plan out because it's too much." Appellant texted, "Can you just call me to tell me plan because I've been waiting all day," "I really have. Really scared," and "I need you to finish the job w[] Philip." Mazel understood the text to mean that he would hurt Philip.

On May 23, 2012, appellant again left Philip, taking the children with her. According to Philip, on that day, A. and L. got into a fight over television programs, so Philip turned the television off. A. went down the hall to appellant. Appellant then came up to Philip, screaming that he had hit A. Philip said he had not hit A. A little later, appellant left with the children, saying she was taking them to preschool. At 5:00 p.m., Philip called appellant's cell phone to find out where the children were. Appellant said

5

they had a play date and would be home around 10:00 p.m. Philip fell asleep before then. When Philip awoke the next morning, appellant and the children were not there.

Philip called appellant, who said they were having fun and would be home soon. They did not come home that day. Philip exchanged texts and some cell phone calls with appellant. He said he was going to go to the police. At some point, appellant texted Philip, "I know what you did to A[.]" Philip replied that her charges were false. Appellant did not respond to that text. The last text Philip received was around May 27, 2012. He had no further contact with appellant until she was arrested.

Appellant gave a different account of the events of May 23 in her text and e-mail messages to Mazel. She wrote, "I'm crying now. I just can't take this guy anymore. He just called me and told me he wants a date night with me soon, which means he'll force himself on me again. I can't tell you how much pain I'm in. I'm so scared. How could this be life my mother told me would be good." Later, appellant wrote Mazel, "He got home. Bad scene. Trying to force himself on me. I was doing nothing to anyone, just sleeping with my babies. He finally left me alone, but he is not stable. I thought there was a plan for tonight, but here he was at me again. I'm hanging on by a string. There's so much at stake. There is nowhere to turn to. It will never end." Mazel texted appellant, "Stay with the kids. I will call you in a bit. I will be there in morning." Appellant replied, "I'm with kids. I sleep, eat with them every night, but you don't understand. He has just tried to force himself on me in front of them. They did not wake up because I do not scream because I don't want them to wake up. I just get so sick to my stomach. He stopped, and they luckily did not wake up. I don't ever cry in front of them, but it's still not a safe home for children. Even with two consenting adults, children should never witness parents having sex or initiating it. My being here is the catalyst for them witnessing abuse. I'm damned if I stay or go. They are never really safe."

At some time that day, appellant texted Mazel, "I'm not ready to prosecute until I know full custody [r]ights," "It's just too delicate. I can't lose over premature action," "Please understand. The reason I liked your first plan is I feel it protects my daughter the

6

most because it doesn't involve me," and "I have messed up everything up every time I've done anything by the book.  I am not putting myself first.  I think your first plan protects A[.] because family law doesn't care about kids.  It's not as easy as you think."  Mazel and appellant's first plan had been to get "dirt" on Philip.

In another text message or e-mail that day, appellant wrote she was up all night afraid Philip would return, that a few months ago he chased her all over the house screaming at her in front of the children, that she had to have sex with him or he would "crush" her, that the children cried, and that lawyers said without proof she had nothing.  She also wrote, "I thought you had a plan for last night," that she had borrowed the last $100 for him, and that she gave him everything else she had.

Later in the day, Mazel received a text from appellant which stated, "Philip just yelled at me I'm not allowed to take the children to the pool if my friend is there unless he meets her and gets her number.  . . .  Philip can bench press 225 pounds.  . . .  I'm 128 pounds.  He just shook me because I told him I should be allowed to just go swimming with children.  I was very sweet about it."  Appellant also texted, "I'm in prison with my children.  I would not contact you incessantly if I had nowhere [sic] else to turn."

Appellant next sent Mazel a text saying, "A[.] just came crying to me screaming Philip kicked her," "What are you doing," "I must talk to you," "It's too much," and "You have to get over here and talk to her."  A few minutes later, appellant texted, "Now," "It's gone on too long," and "You must be a witness."  Mazel replied, "Okay.  We will be over."  Appellant replied, "Forget it.  I'm taking her to a friend's," "He kicked her in the fucking shoulder," "Do you understand," and "Do you not call anyone.  I can't answer."  Mazel replied, "Will you wait for me," and appellant replied, "I will get her out of the house and call her, but you need to get your group together, whatever, and just do it."  Mazel understood that to mean that he would meet with two associates and take care of Philip by breaking his arms and legs.  Appellant replied, "It's too fucking much," "Fuck him," "He kicked my girl," and "He fucking kicked her."  Mazel replied, "I'm on my way.  Where should we meet," "You can't trust anyone," and "Will you wait for me."  Appellant texted, "You said you'd be here in morning.  You never came," "My God, you

7

can't believe this is happening," "There is no mark," "I'm fucked," "This is a nightmare," "My baby girl," and "Fuck this mother fucker." Mazel replied, "Do you want to meet," and appellant replied, "I was almost raped in front of my kids last night." Appellant also texted, "I spen[t] 85K already. Have nothing left." Appellant also texted, "This asshole just came in and screamed at A[.], telling her not to lie, that she knows he didn't kick her. If I didn't know this fucker, I'd believe him."

About an hour later, Mazel replied, and appellant responded, "I asked A[.] if Philip kicked her, and she put her head down, nodded, 'Yes, but don't tell daddy anymore,'" "You must go out of box. Believe me, if I gave my life savings to a lawyer, I will help you if you save us," "Just get us the fuck out," "This is the same magnitude of those bastards who trafficked the Mexican girls. It's just a fancy address on it instead and, in a way, is more difficult to get out," and "But the abuse and sense of being held captive by Philip, his fucked up parents and the sicko security guard and the paid off judge [is] the same." Mazel replied, "I'm on my way."

Appellant texted Mazel that she took the children to the Oakwood apartment complex to swim because, "It is the only place I can distract them and talk with you where he will not find us. You park in front. Just come into poolside. I'm going to lose control if something doesn't move soon. He kicked my daughter. Who could hurt her," "Fuck him," "4111 South Via Marina, Marina del Rey," which was the Oakwood address, and "I'm expecting you to come."

In addition to sending text messages to Mazel, appellant called him and said that Philip had raped her, punched her in the eye and sexually abused her. She wanted Mazel to come to the swimming pool at the Oakwood Apartments in the Marina, so that he could see that she had been raped and abused and A. had been sexually abused. Mazel came to the pool. He saw what he believed to be a bruise on appellant's left eye. Mazel said that if A. had been molested, he was going to take them to the hospital. Appellant did not want to go to the hospital. Appellant began applying sunscreen, and part of what Mazel believed was the bruise wiped away. Appellant told A. to talk to Mazel. A. said that her father had touched her genitals and also kicked her.

8

Mazel went to the Pacific Division police station and told police what was going on. He told appellant to meet him at the hospital with the children. She did so. When Mazel saw appellant at the hospital, her bruise had completely disappeared. There were four police officers at the hospital, and they took appellant and A. for an interview.

When they were finished at the hospital, Mazel took appellant and the children to a hotel in Marina Del Rey. Mazel paid for about a week at the hotel, plus food and clothing. During this time, appellant and Mazel discussed the plan to "whack" or hurt Philip, and also Mazel's payment. Mazel did not remember details of the discussion.[4] According to Mazel, appellant coached the children to say that Philip hit them, promising them candy and travel to France if they repeated the accusations. Mazel also stated that appellant wanted to go to Mexico, then on to France after appellant was "whacked."

Mazel next took appellant and the children to a shelter in Pomona. After a few days, appellant called Mazel on her cell phone. Mazel was supposed to kill Philip while appellant was at the shelter, so that appellant would have an alibi.

Meanwhile, Mazel was speaking with Philip on the phone. Mazel told Philip that appellant and the children were safe, but that Philip was in harm's way because of "a big deal coming out of New York involving millions of dollars." In subsequent calls, Mazel told Philip that he had spent money on behalf of appellant and the children and wanted to be reimbursed.

Philip went to the police, filed a child concealment report, and told Detective Serna about the calls from Mazel.

On May 31, 2012, Philip met with Mazel at a Panera's restaurant in Marina del Rey. Philip's father David also attended the meeting. Mazel told Philip that appellant was threatening Philip's life and planning on leaving, but Philip did not believe him. Appellant called Mazel during the meeting, and Mazel surreptitiously put her on speakerphone. According to statements which Philip and David later provided to police, Mazel and appellant discussed plans to seriously injure or kill Philip. Appellant said that

---

**4**    During this time, appellant and Mazel also had sex more than once.

9

it had to be done that night. After the call, Philip said overhearing a call was useless. Mazel said he would record his next conversation with appellant.

On June 1, 2012, Mazel met Philip and David at the Marina City tennis courts. Mazel played a recording of a conversation with appellant. In it, appellant told Mazel details of how to "whack" Philip. Mazel gave Philip a copy of the recording.

After the meeting, Philip went to the police department in downtown Los Angeles and meet with Detectives Dan Myers and George Diaz. Philip gave Mazel's recording to the detectives, and also provided a written statement about the call he heard on speakerphone. David also provided a written statement about the call.

At some point, Mazel moved appellant and the children out of the shelter and into the Anaheim Hilton. Philip was aware of the move, and booked the hotel room on his computer. He gave Mazel $300 so that appellant could take the children to Disneyland. Philip also gave Mazel money for expenses. Appellant was unaware of Philip's involvement with Mazel. While at the Hilton, A. said appellant had been hit by Philip and Philip had touched A.'s genitals a few times. According to Mazel, A. made these statements when food treats were offered.

On June 4, 2012, Mazel was interviewed by Los Angeles Police Detectives Chris Gable and Barry Telis. During the interview, Mazel called appellant and told her that Philip was dead. Appellant said she did not want to go to jail. Mazel said the man who attacked Philip needed to be paid, and appellant said she had no money. Mazel suggested she sell the car. Mazel reminded appellant that she had asked him to break Philip's legs and that if he died it was no big deal. Appellant agreed to sell the car.

Mazel met appellant at her hotel. Detective Gable called Mazel, pretending to be a friend named Tony. Detective Gable said he had confirmed with a friend at the hospital morgue that Philip was dead and foul play was suspected. Very shortly thereafter, appellant and Mazel left the hotel in appellant's Mercedes.

Mazel was under surveillance, and conveyed to the police that appellant was planning to go to Mexico. He arranged with police for appellant's arrest to occur in Brea.

10

Police did arrest appellant in Brea. They found a passport with appellant's photograph in the name of Kassandra Katrina O'Donnell in her purse.

After appellant was arrested, Philip went to court and obtained full legal and physical custody of the children.

In January 2013, Mazel began calling Philip and leaving messages accusing him of being a child molester. Mazel also called appellant's attorney, Mark Overland, and said that appellant was innocent and he would help get her off. He indicated that appellant was being framed by Philip. At trial, Mazel said the accusations against Philip were not true.

On February 22, 2013, Mazel made criminal threats against Philip. He pled guilty to making the threats about a month and a half before the trial of this matter. Mazel testified at appellant's trial under a grant of immunity.

Appellant called numerous witnesses in her defense. She introduced testimony from Los Angeles Police Officer Stephen Johnson who responded to a report of domestic violence at the Levens's house on March 16, 2012. He observed a small contusion near appellant's right eye and a one-inch cut on her lip. Appellant said the injuries were caused by Philip.

Appellant also offered testimony from Detective Serna about the detective's interactions with Philip and also with Mazel. Detective Serna also testified that she called Carol Tantau, a domestic violence advocate, on appellant's behalf. Tantau helped appellant find a place at the shelter in Pomona. Tantau testified about her discussions with appellant. Tantau did not see a large bruise near appellant's eye.

Appellant also called Perla Garcia, a social worker for the Department of Children and Family Services, who had observed an interview of A. and L. In the interview, A. said that Philip touched her vagina when she was a year old. A. also said appellant had a black eye from falling. L. said Philip punched appellant and gave her a black eye. Garcia then interviewed Philip, who said that he pushed appellant away in self-defense during an argument and she hit a doorpost. When Garcia interviewed appellant, she said

11

her lip was cut while she and Philip were struggling for control of appellant's cell phone, she bit his finger to gain control of her phone and he punched her in the mouth and eye.

Discussion

1.  Self-defense and defense of others

Appellant contends the trial court erred in excluding evidence that she acted in self-defense and defense of others (hereafter collectively "self-defense").[5]  She further contends this error violated her federal constitutional rights to due process and to present a defense.  There was no error and no violation of appellant's constitutional rights.

a. Motion to exclude

Before trial, the prosecution moved in limine to exclude evidence that appellant was a victim of domestic abuse during her marriage, and also evidence that Philip molested their daughter A.  The prosecution argued that the evidence did not show that appellant had a belief of imminent danger to life or great bodily injury.

The trial court granted the motion, explaining, "Here, it's my understanding that the defendant was not in the immediate presence of a target, and hence not in immediate danger when she allegedly made the solicitation."  The court added, "And all the cases I have seen, that have been reported, the killer or associates are in the immediate presence of the target."  The court asked appellant's trial counsel, "Was she in the immediate presence of the target when the solicitation was made, the alleged solicitation?"  Counsel replied, "No, no.  But that doesn't matter."

Near the end of the case, during a discussion of jury instructions, the trial court stated that it had not heard anything in the testimony to change its mind on the issues of self-defense and defense of others.  The court rejected appellant's counsel's request for jury instructions on self-defense and defense of others.

---

[5]    The trial court did admit evidence of domestic abuse by Philip to show his bias.

12

b.  Applicable law

"For killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend.  [Citation.]  If the belief subjectively exists but is objectively unreasonable, there is 'imperfect self-defense,' i.e., 'the defendant is deemed to have acted without malice and cannot be convicted of murder,' but can be convicted of manslaughter.  [Citation.]" (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)  For both perfect and imperfect self-defense, the defendant must fear imminent harm.  (*Ibid*.)  "Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice.  The defendant's fear must be of *imminent* danger to life or great bodily injury.  '"[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future.  *An imminent peril is one that, from appearances, must be instantly dealt with."* . . . [¶]  This definition of imminence reflects the great value our society places on human life.'  (*People v. Aris* (1989) 215 Cal.App.3d 1178, 1187, 1189 [264 Cal.Rptr. 167], italics added.)"  (*In re Christian S.* (1994) 7 Cal.4th 768, 783.)

Evidence of intimate partner battering and its effects will often be relevant to show both imperfect and perfect self-defense.  (*People v. Humphrey, supra*, 13 Cal.4th at pp. 1083-1087 [using the term "battered woman syndrome" to reflect then-current statutory phrasing].)  "As violence increases over time, and threats gain credibility, a battered person might become sensitized and thus able reasonably to discern when danger is real and when it is not.  '[An] expert's testimony might . . . enable the jury to find that the battered [woman] . . . is particularly able to predict accurately the likely extent of violence in any attack on her.  That conclusion could significantly affect the jury's

evaluation of the *reasonableness* of defendant's fear for her life.' [Citation.]" (*Id*. at p. 1086.)[6]

c. Analysis

Appellant has not cited, and we are not aware of, any cases considering a self-defense claim to a charge of soliciting a crime. The offense of solicitation contemplates the commission of the solicited act in the future, and so appears at odds in most instances with a claim of self-defense, which requires instant action. We agree with the trial court that "[t]here may be a situation where self-defense is available as a defense to solicitation to commit murder or assault, but that situation is not present here."

The trial court premised its ruling on the fact that Philip was not present at any time when a solicitation might have occurred. On appeal, appellant contends the evidence at trial showed the crime of solicitation was complete on May 23, and text messages from that date showed she was in Philip's presence when she made the solicitation. Thus, appellant believes, the trial court should have reconsidered its ruling and instructed the jury on self-defense. Appellant's counsel did not point out to the trial court that counsel's earlier representation had proven incorrect and the evidence had now shown that appellant was in Philip's presence when appellant communicated with Mazel and requested the trial court to reconsider its ruling on that basis.

Assuming for the sake of argument that appellant's characterization of the evidence is correct, and that appellant has not forfeited her claim, there was still no error in the trial court's exclusion of the evidence.

Even if Philip were present with appellant on May 23, Mazel was not. Any action Mazel could take at appellant's behest could only take place in the future. Mazel would

---

[6] Further, "'[t]he cyclical nature of an intimate battering relationship enables a battered spouse to become expert at recognizing the warning signs of an impending assault from her partner—signs frequently imperceptible to outsiders. For some victims, the sign may be 'that look in his eye;' for others, it is the advent of heavy drinking, or heightened irrational jealousy.' [Citation.]" (*People v. Humphrey, supra*, 13 Cal.4th at p. 1099 [conc. opn. of Brown, J.].)

have to physically come to appellant's and Philip's location. California law requires a "belief that the party threatened will lose his life or suffer serious bodily injury unless he immediately defends himself against the attack of his adversary." (*People v. Aris, supra*, 215 Cal.App.3d at p. 1188, quoting *People v. Scoggins* (1869) 37 Cal. 676, 683-684.) "'It certainly is not the law that a defendant can justify the taking of human life upon the belief that danger is about to become imminent, or that it will in the future become imminent. . . . [There must be] imminent danger of such design being accomplished, and this *at the time the fatal shot was fired.*' [Citation.]" (*People v. Aris, supra*, 215 Cal.App.3d at p. 1188, italics added.) Appellant did not immediately defend herself from any perceived peril from Philip while the two were together on May 23. At most, she arranged for Mazel to "defend" her at some future point. While the crime of solicitation was complete when appellant made her request, such a planned future assault or killing cannot be justified as self-defense.

Appellant's reliance on *People v. Humphrey, supra*, 13 Cal.4th 1073 to show error is misplaced. As we discuss above, the holding in that case involves a defendant's perception of the imminence of a threat. The court recognized that intimate partner battering and its effects may make a person more sensitive to signs of a threat from her batterer, and so evidence of that syndrome is relevant to a claim of self-defense. Nothing in *Humphrey* suggests that a battered person who fears imminent peril can arrange to assault or kill her batterer in the future and still claim self-defense.

2. Unanimity instruction

Appellant contends the trial court erred in failing to instruct the jurors sua sponte that they were required to agree on which act constituted the charged offense. She further contends this error violated her federal constitutional right to due process. There was no error and no violation of appellant's constitutional rights.

15

a.  Applicable law

A unanimity instruction must be given sua sponte by the court when the prosecution presents multiple acts to prove a single charge, unless the prosecution elects to rely upon one act only.  (See *People v. Russo* (2001) 25 Cal.4th 1124, 1132.)  "The unanimity instruction is not required when the acts alleged are so closely connected as to form part of one transaction.  [Citations.]  The 'continuous conduct' rule applies when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them.  [Citation.]"  (*People v. Stankewitz* (1990) 51 Cal.3d 72, 100.)  A unanimity instruction is also not required if the evidence shows "only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed. . . ."  (*People v. Russo, supra*, 25 Cal.4th at p. 1132.)  For example, in a burglary prosecution, the jury need not agree on which of several felonies the defendant intended to commit once he was inside the dwelling. (*People v. Failla* (1966) 64 Cal.2d 560, 569.)


b.  Analysis

Here, there were two solicitation charges, and the jury was instructed to decide whether appellant solicited one crime or two.[7]  Apart from this distinction, both sides treated the communications between appellant and Mazel as a series of acts forming part of one transaction.  The prosecutor argued that the communications showed an evolving plan, first to discredit, then to injure, then to kill Philip.  The defense argued that appellant was merely acquiescing in plans for crimes put forth by Mazel, not soliciting those crimes.  Apart from the nature of the crime being solicited, there was no reasonable basis to distinguish the communications substantively.  They were all directed at refining

---

[7]     The jury was instructed, pursuant to CALCRIM No. 441, that, "If you find the defendant guilty of solicitation, you must decide how many crimes she solicited."  The instruction gave jurors a list of factors to consider, then told the jury, "Consider all of these factors when deciding whether the defendant's alleged acts were a single crime or two separate crimes of solicitation."  Thus, the jury was instructed that it had to agree on which, if any, crimes were solicited.

16

the details of the commission of the crimes, such as when and how the assault would be carried out. Because the communications were so closely connected as to form one transaction, to which appellant offered the same defense, and there was no reasonable basis to distinguish between the communications, a unanimity instruction was not required.

Appellant does not dispute that her defense to all the communications was the same, but contends the trial court's ruling on self-defense precluded her from offering a defense which distinguished the acts. In the absence of that ruling, she contends she would have argued the evidence showed that any solicitation took place on May 23 and was made while she was in the presence of a menacing Philip and that she was acting in self-defense or defense of others. As we discuss in section 1 above, the evidence did not support claims by appellant of self-defense. Thus, there was no need for a unanimity instruction.

### 3. Character evidence

Appellant contends the trial court erred in admitting testimony from Esteves that appellant offered her money to testify falsely in court proceedings that Philip was physically abusive to her.[8] She contends the evidence was not admissible under Evidence Code section 1101 and also should have been excluded under Evidence Code section 352 because it was more prejudicial than probative. We do not agree.

### a. Court proceedings

After the prosecutor described the proposed testimony of Esteves, appellant's counsel objected that the evidence was "[i]rrelevant and improper character evidence

---

[8] In her opening brief, appellant also contended the trial court erred in admitting evidence that appellant had kidnapped or concealed the children in February and May 2012. Respondent contended that she forfeited this claim by failing to object. However, appellant expressly abandoned this claim in her reply brief. Accordingly, we do not consider these claims.

under [sections] 1101 and 1102 of the Evidence Code." The trial court asked, "What about the very last proffer that this allegation that Ms. Levens asked the witness to lie about a particular incident?" Appellant's counsel replied, "I think that's arguably relevant in terms of the evidence . . . [b]ut I'd ask it be excluded under 352." After consideration, the court ruled, "Arguably there's some relevant testimony within [the] proffer. The only portion that I think is certainly relevant and appropriate to include in your case in chief is the last portion of the proffer which is this allegation that Ms. Levens asked Ms. Esteves to make a false—make a false report about her husband and the offering of money."

b. Applicable law

Subdivision (a) of Evidence Code section 1101 provides that evidence of a person's character or trait of character, including specific instances of his or her conduct, is inadmissible when offered to prove his or her conduct on a specified occasion. Subdivision (b) provides that evidence that a person committed a crime or other act is admissible when offered to prove other facts such as motive, opportunity, intent, preparation or plan.

Admissibility of character evidence requires some similarity between the prior act and the charged offense. "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] . . . In order to be admissible to prove intent, the uncharged conduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.]" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.) "A greater degree of similarity is required in order to prove the existence of a common design or plan. . . . [E]vidence of uncharged misconduct must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are individual manifestations.'" (*Ibid.*)

18

Section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

c. Analysis

Appellant contends the Esteves incident was too remote in time to be probative of a plan or motive in the current case. She also contends that the prior act of attempting to bribe a witness in an unrelated hearing has no similarity to the charged act of soliciting assault. We do not agree.

Both incidents arose out of the Levens's marital discord and related to appellant's desire to discredit Philip so that she could obtain full custody of her children, and to a lesser extent, gain financially. Although about 18 months elapsed between the two incidents, evidence showed that the marital discord continued in the interim, as did appellant's attempts to achieve her goals. In February 2012, before the incident with Mazel, appellant filed for a divorce and made admittedly false allegations of abuse against Philip. Thus, appellant's offer to Esteves was not simply an isolated past incident which was too remote to have any probative value.

The two incidents have a number of similarities. In both cases, appellant attempted to pay a third party to manufacture evidence to discredit Philip. Appellant wanted Esteves to lie, and she initially wanted Mazel to plant illegal drugs on Philip. There are some differences in the two incidents, primarily because Mazel, unlike Esteves, indicated a willingness to assist appellant. Once Mazel agreed to assist appellant, her plan evolved into the charged incident of assaulting Philip.

Although the Esteves incident was relevant, the trial court retained authority to exclude the evidence under Evidence Code section 352. On appeal, appellant contends the record does not establish the trial court weighed the probative value of the uncharged offense against the danger of undue prejudice under Evidence Code section 352. Appellant did not claim in the trial court that the potential for undue prejudice from the

19

incident outweighed its probative value. Appellant's only Evidence Code section 352 objection was that the probative value of the evidence was outweighed by the potential for an undue consumption of time. The court ruled that it would allow "limited inquiry" into the matter, and warned the prosecutor that defense counsel "may have a very good argument that other witnesses are relevant" to rebut Esteves. Appellant does not contend this ruling was an abuse of discretion.

Assuming for the sake of argument that appellant has not waived her Evidence Code section 352 claim, she has not shown error. A trial court "need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing functions under Evidence Code section 352." (*People v. Taylor* (2001) 26 Cal.4th 1155, 1169.) The fact that a hearing is held at which the parties argue Evidence Code section 352 factors prior to the trial court's ruling normally demonstrates that the court was aware of, and performed its balancing function under Evidence Code section 352, even if the trial court did not make an express statement on the record. (See *People v. Padilla* (1995) 11 Cal.4th 891, 924.)

### d. CALCRIM No. 375

The trial court instructed the jury with CALCRIM No. 375 on the use of evidence of uncharged acts to show plan or motive. Appellant contends the trial court erred in giving this instruction because the Esteves incident was not relevant to show a plan. As we discuss in subsection c, above, the evidence is relevant for this purpose. Accordingly the trial court did not err.

### 4. CALCRIM No. 371

Appellant contends the trial court erred in instructing the jury with CALCRIM No. 371 concerning consciousness of guilt.

a. Instruction

CALCRIM No. 371 provides: "If the defendant tried to create false evidence or obtain false testimony, that conduct may show that she was aware of her guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself."

Although there may have been other instances of appellant attempting to obtain false testimony or create false evidence,[9] the prosecutor relied only on the Esteves incident to support his request for CALCRIM No. 371.

b. Analysis

To the extent the trial court gave the instruction based solely on the Esteves incident, the court erred. At a minimum, the false testimony or fabricated evidence must relate to the charges at trial. The instruction makes no sense otherwise. For example, a person's attempt to obtain false testimony in a divorce proceeding showing that his spouse has committed adultery does not show consciousness of guilt of a robbery charge against the person in a criminal proceeding.

Here, Esteves's testimony shows appellant's offer involved testifying falsely in family law proceedings. Esteves was initially asked, "[W]hen did the defendant come to you and offer you money?" and was then asked "[W]hat did the defendant say to you exactly?" Esteves replied, "Exactly? She asked me if was willing to—that if she divorced Mr. Philip, that she wanted complete custody." On cross-examination, Esteves testified, "When this is happened, all the time she [had] these stories about [wanting] to have divorce with Philip. . . ." She also testified, "She wanted custody and have divorce

---

[9]    There may have been another attempt by appellant to obtain false testimony, and that attempt would relate directly to this case. Appellant told Mazel that Stephanie Caspian was going to be her alibi for "[w]hatever happened to Philip" or "[w]hen Philip got whacked." However, there is no indication when this discussion took place and so it could reflect either pre-crime planning or post-crime lying. Respondent does not mention this incident in its brief.

21

with Philip. I think she want me come to the court to say bad things of Philip to get divorce or to get custody or to get the money."

Respondent is correct that CALCRIM No. 371 "does not require judicial proceedings to actually be in progress when the attempt to procure false testimony or to fabricate evidence is made." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1139 [discussing CALJIC No. 2.04, the precursor to CALCRIM No. 371].) However, there must be sufficient evidence from which "the jury could reasonably infer from the incident that defendant expected [the person suborned] to be a witness in the event of a trial, or that defendant sought to fabricate evidence in anticipation of a trial." (*Ibid.*) Thus, if the evidence showed that appellant expected Esteves to be a witness in appellant's criminal prosecution, the evidence would be admissible. It does not.

Appellant's request to Esteves to lie was made more than a year before she even met Mazel, and so more than a year before she engaged in the criminal conduct charged in this case, and more than two years before the trial of this matter. In order for appellant's request to Mazel to be relevant in the present case, there would have to be some evidence indicating that, at the time appellant solicited Esteves, appellant was planning to assault Philip (or cause him to be assaulted), assert self-defense if charged with a crime and have Esteves provide false testimony of abuse to support her defense. There is no evidence to support such an inference. The evidence all indicates that appellant wanted Esteves to testify in some sort of family law proceeding.

c. Prejudice

Even if the trial court erred in giving CALCRIM No. 371, there was no prejudice to appellant from this instruction. The instruction tells the jury that if it finds the defendant tried to fabricate evidence, that conduct "may" show the defendant was aware of her guilt, but it is up to the jury to consider the meaning and importance of the conduct. The most reasonable understanding of the instruction would be that it is

22

referring to fabricating evidence for the criminal trial on which the jury is sitting, particularly since the instruction uses the word "guilt," and the jury was charged with deciding if the defendant was guilty or not guilty.  Since Esteves's testimony was not solicited for the criminal trial, the jury would have simply disregarded it.  (See *People v. Jackson* (1996) 13 Cal.4th 1164, 1225 ["[A]t worst, there was no evidence to support the instruction and . . . it was superfluous"].)  Even if the jury read the instruction more broadly, and found appellant's conduct showed awareness of guilt, there is no reasonable probability (or possibility) that this error contributed to the verdict.  The other evidence of appellant's guilt was overwhelming.

### 5.  Section 653f

The trial court instructed the jury on the offense of soliciting a crime in violation of section 653f using a modified version of CALCRIM No. 441.  Appellant contends the trial court erred in modifying the instruction.  We agree, but find no prejudice to appellant.

### a.  Instruction

Appellant's defense was that it was Mazel's idea to commit the crimes against Philip, and she merely agreed to his plans.  As CALCRIM No. 442 correctly states:  "An agreement to commit a crime does not constitute the crime of solicitation."  However, immediately following this sentence, the trial court added the following sentence:  "It does not matter where the idea for the crime originated from."  The court relied on

*People v. Shapiro* (1959) 170 Cal.App.2d 468 (*Shapiro*), to support this modification.[10]

b. Analysis

We agree with appellant that this sentence should not have been added to the instruction. The court in *Shapiro* wrote only that "the origin of the idea is not the true test." (*People v. Shapiro, supra,* 170 Cal.App.2d at p. 478.) The court did not say that the origin of the idea did not matter at all. The origin of the idea does have some probative value as to whether a defendant solicited a crime or agreed to another's suggestion to commit a crime, although it is clearly not determinative. If a defendant originated the criminal idea, this would make it more likely that she solicited the crime. Conversely, if the solicited party came up with the criminal idea, this would make it more likely that the defendant agreed to the criminal idea.

We do not agree with appellant that the court should have made a distinction between a general solicitation and a subsequent more specific one since "[i]f Mazel had the idea and plan, including its specifics, to harm Mr. Levens, he alone was the solicitor." A request to another to commit a crime made in general terms is normally sufficient to constitute a solicitation. The crime of solicitation is complete once the request has been made. Thus, there is no response by the solicited party which can relieve the requesting

---

**10** Both *Shapiro, supra,* 170 Cal.App.2d 468 and *People v. Wayne* (1953) 41 Cal.2d 814 (*Wayne*), upon which respondent relies, involve charges of solicitation of bribery. Bribery is a somewhat unusual crime under the solicitation statute, as section 653f makes it a crime to solicit another to accept a bribe or to offer a bribe. Thus, negotiations about the details of the bribe may result in the soliciting party becoming the solicited party. For example, the defendant may offer the police officer $200 to ignore a traffic violation, and thus solicit the officer to accept a bribe. The police officer may respond that he thinks the defendant could do better than that, or that a traffic ticket would cost the defendant more than $200 and thus solicit the defendant to offer a bribe. (See *Wayne, supra*, 41 Cal.2d at p. 825 [where "May first solicited [defendant] in general terms and thereafter [defendant] solicited May to join in the offer of a bribe on specific terms, there are two criminal solicitations"].) For other crimes, no such shifting can occur. If appellant asked Mazel to "hurt" Philip, she solicited an assault. If Mazel replies that he could break Philip's arms and legs, and appellant agrees, Mazel has not solicited an assault. Thus, *Shapiro* and *Wayne* are of limited use in cases involving solicitation of crimes other than bribery.

party from criminal liability. If, as appellant posits, the solicited party responds with an offer containing more detailed terms, the solicited party may, under some circumstances have become a soliciting party and committed the offense of solicitation himself. (See *Wayne, supra,* 41 Cal.2d 825 ["[w]here . . . May first solicited [defendant] in general terms and thereafter [defendant] solicited May to join in the offer of a bribe on a specific terms, there are two criminal solicitations"].)

c. Prejudice

There was no prejudice to appellant in this case from the additional sentence, which suggested that the origin of the criminal idea had no probative value. There was at best very weak evidence that Mazel originated the criminal idea. Appellant points to text messages from appellant to Mazel on May 22 and 23 in which she asked Mazel to "figure out a plan" and "tell me the plan" and made a reference to "your first plan" to show Mazel as the originator. In that same series of texts appellant also texted Mazel, "Are you figuring out strategy for our business plan?" These statements do not suggest that the idea of committing a crime originated with Mazel. They simply suggest that there had been ongoing discussions about the details of or strategy for committing the crime. In contrast, there was solid evidence that the criminal idea originated with appellant. Mazel testified that at their second meeting, after he told appellant that he could not find any "dirt" on Philip, appellant asked him to plant drugs on Philip and to find somebody to break Philip's legs and arms. This exchange strongly indicates that the idea for the crime originated with appellant.

Further, the instruction made it clear that appellant had to "request, ask, implore, entreat or make a proposal" to Mazel to commit murder or assault. The instruction was equally clear that appellant did not commit the crime of solicitation if she simply agreed with Mazel. Thus, there is no reasonable probability (or possibility) that appellant would have received a more favorable outcome in the absence of the additional evidence.

25

6. Motion to vacate the judgment

Appellant alleges the prosecution violated *Brady v. Maryland* (1963) 373 U.S. 83 ("*Brady*") by suppressing evidence showing that Mazel, Philip and David fabricated evidence material to her guilt in a conspiracy to obstruct justice. She further alleges that the prosecution's suppression of that evidence was misconduct by a government official that resulted in the presentation of fabricated evidence at trial within the meaning of section 1473.6, subdivision (a)(3). Appellant has not made a prima facie showing for relief under section 1473.6.

a. Procedural law

Section 1473.6 provides that a person no longer in custody may file a motion to vacate a judgment on the ground of "[n]ewly discovered evidence of misconduct by a government official committed in the underlying case that resulted in fabrication of evidence that was substantially material and probative on the issue of guilt or punishment." (§ 1473.6, subd. (a)(3).) "'[N]ewly discovered evidence' is evidence that could not have been discovered with reasonable diligence prior to judgment." (§ 1437.6, subd. (b).)

Section 1473.6 was enacted in response to the Rampart scandal, to provide a means of relief for individuals who are no longer in custody when "they learn that their conviction was obtained in part because of fraud or false evidence by a government official." (*People v. Germany* (2005) 133 Cal.App.4th 784, 791.)

The procedures for bringing and adjudicating such a motion are the same as for prosecuting a writ of habeas corpus. (§ 1473.6, subd. (c).) "Thus, if the party moving to vacate under section 1473.6 makes a prima facie showing for relief, the . . . court must issue an order to show cause. (Rule 4.551(c)(1).) In deciding whether a prima facie showing has been made, 'the court takes [the moving party's] factual allegations as true and makes a preliminary assessment regarding whether [the moving party] would be entitled to relief if his . . . factual allegations were proved.' (*Ibid.*)" (*People v. Germany, supra,* 133 Cal.App.4th at p. 790.)

b. *Brady* obligations

Under the due process clause of the federal constitution, as explained in *Brady, supra,* 373 U.S. 83, and its progeny, "the government has the obligation to disclose to the defendant evidence in its possession that is favorable to the accused and material to the issues of guilt or punishment. [Citations.]" (*People v. Jenkins* (2000) 22 Cal.4th 900, 954.) Evidence is favorable to the accused if it is exculpatory of the accused or impeaching of witnesses against the accused. (*Strickler v. Greene* (1999) 527 U.S. 263, 281-282.) "Evidence is material if a reasonable probability exists that a different result would have occurred in the proceeding had the evidence been disclosed to the defense. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceedings. [Citations.]" (*People v. Jenkins, supra,* 22 Cal.4th at p. 954.)

A prosecutor is charged with constructive knowledge of *Brady* material possessed by investigating officers. (See, e.g., *Kyles v. Whitley* (1995) 514 U.S. 419, 437.)

c. Track 3 recording

As part of the original discovery in the underlying case, the prosecution gave appellant a copy of a property report describing the items of appellant's property in the custody of the Los Angeles Police Department. One entry read: "The below-listed item was recovered by Detective G. Diaz, serial 26032 (RHD), from Gary Mazel on June 1st, 2012. Detective Diaz met Gary Mazel in the area of Imperial Highway and the 57 Freeway in the City of Brea. Digital recorder, Olympus VN-7100 white digital recorder." Shortly after appellant was sentenced in this matter, her property was returned to her. The recorder was among the items returned to her. Appellant or her attorneys listened to the contents of the recorder and on "track 3" of the recorder discovered what they believed to be favorable material evidence which had not been disclosed by the prosecution.[11]

---

[11] Appellant made a motion to vacate the judgment based on this ground in the trial court. The court denied the motion.

Appellant alleges the prosecution's suppression of the track 3 recording resulted in the presentation of fabricated evidence at trial. The only fabricated evidence appellant identifies is instances of allegedly false trial testimony by Philip and David. At most, the men's statements on the track 3 recording would contradict aspects of their trial testimony. There is no indication in the recording that the prosecution had any involvement in the creation of the allegedly false testimony. Thus, what appellant is describing is the prosecution's failure to disclose impeaching evidence. A failure to disclose impeaching evidence can be a *Brady* violation. (See *Strickler v. Greene, supra,* 527 U.S. 263, 281-282.)

The unusual circumstances of this case raise a number of interesting questions about whether appellant had a duty to investigate a witness's recorder which was inadvertently included in her property by the police department. (See *United States* v. *Valera* (11th Cir.1988) 845 F.2d 923, 927-928 [noting that numerous cases have held that the government is not required under *Brady* to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself].) It also raises questions about whether the prosecution's transcription of some tracks on the recorder creates an inference that the prosecution or an investigating officer listened to all tracks on the recorder and was aware of their contents.[12]

We will assume for the sake of argument that appellant had no duty to investigate the recorder, the prosecution was aware of the contents of track 3 and the prosecutor had a duty to disclose the contents of track 3 if it contained material evidence favorable to appellant. Based on the unofficial transcript of track 3 provided by appellant, there is no material favorable evidence on the track. Thus, there was no *Brady* violation as to the recorder.

---

[12]     We emphasize that it is not clear that the prosecutor was aware of the contents of the track 3 recording. During the hearing on appellant's motion in the trial court, the prosecutor represented that while Mazel could be heard clearly on the track 3 recording, the other end of the conversation "is almost inaudible in most of the places except for snippets which [defense] counsel was able to transcribe." The prosecutor described the track 3 recording overall as "indecipherable unless it was to be electronically enhanced."

Appellant contends statements in the transcript show that David agreed to pay Mazel more than $1,000 for a recording of appellant discussing the crimes and this would have contradicted David's claim that he only paid $1,000. In the transcript, Mazel says "they charged me an extra 3 last night . . . I'm in the red on this thing," and David replies, "we've got you covered." However, this exchange does not show that David actually paid Mazel any particular amount. Thus, it has no impeachment value.

Appellant contends remarks in the transcript show Philip's involvement in the payment to Mazel. In the transcript, Philip clearly tells Mazel he does not care if Mazel is in the red over the recording. Philip does tell Mazel to talk to David about money, but Philip acknowledged at trial that he was aware that David was giving Mazel money. Thus, these remarks have no impeachment value.

Appellant contends remarks about making a recording of appellant show Philip's involvement in a "scheme" to convict appellant. Appellant is mistaken. The remarks show only that Philip wanted evidence of appellant's wrongdoing to provide to his attorney or to authorities. There is nothing improper in Philip's desire and it does not contradict his trial testimony. Thus, these remarks have no impeachment value.[13]

Appellant claims Philip's statement in the transcript that his attorney has assured him that the children will not be taken from him by Child Protective Services contradicts his statements at trial that he was concerned about the children's safety. Philip's desire to keep his children in his home does not show a lack of concern for the children's safety. Thus, this statement has no impeachment value.

Appellant claims Philip's response to Mazel's statement that appellant is planning to file a complaint against Philip for child abuse and sexual abuse calls into question Philip's denial of abuse at trial. In making this argument, appellant characterizes Philip's statement that he has to go see his lawyer as a response to Mazel's statement. This would

---

[13]     Appellant also contends these remarks would have provided leads to percipient witnesses, specifically Mazel's "brothers" and Philip's family law attorney. Appellant has not alleged she was unaware of the identity of Philip's family law attorney. The fact that Mazel was working with others was known to petitioner. Mazel's reference to "brothers" is not a literal one and does not provide a lead to a witness.

not be an incriminating response. However, the full exchange between Mazel and Philip shows that Philip's statement was not a response to news of the complaint. Philip had first mentioned that he needed to go to his attorney's office before Mazel mentioned the complaint. Both attorney references were made in connection with effort to set up a meeting between Mazel and Philip. Thus, this exchange has no impeachment value.

Since appellant has not shown a *Brady* violation, she has not made a prima facie showing of official misconduct concerning the recorder. Absent such a showing, she is not entitled to relief under section 1473.6,

d. "Good cause" reports

After trial, as part of her divorce proceedings, appellant received two copies of "good cause" reports of domestic abuse filed on her behalf by the district attorney's office. Appellant views these reports as favorable material evidence which had not been disclosed by the prosecution in the criminal matter.

Appellant alleges that the prosecution's suppression of the "good cause" reports resulted in the presentation of fabricated evidence at trial. However, appellant does not clearly explain how any suppression resulted in the presentation of fabricated evidence at trial.

Section 278.7 provides that a person with the right of custody of a child will not be charged with parental kidnapping if he or she takes away and conceals the child to prevent harm to the child, as long as the parent files a report with the office of the district attorney within 10 days of the concealment. These reports are referred to as "good cause" reports. Appellant has attached the two reports filed on her behalf as Exhibit 3 to the motion to vacate.

In her reply brief, appellant suggests that the reports could have been "a defense to . . . false testimony" by Philip that she kidnapped or concealed the children. Philip's description of appellant's actions as kidnapping or child concealment was essentially his non-legal characterization of those actions. If appellant could show that Philip used that description knowing that appellant's actions were legal, she could impeach him on that

30

point. However, the prosecution's possession of the reports does not show such knowing falsity on Philip's part during appellant's trial. Thus, appellant has not shown that any fabricated evidence was presented at trial. She is not entitled to relief under section 1473.6.

Further, appellant has not shown a *Brady* violation by the prosecutor and thus has not shown any misconduct. Appellant alleges that, "Unbeknownst to counsel for [appellant], the prosecution had in its possession 'good cause' reports of domestic abuse . . . filed on behalf of [appellant] on February 7 and May 27, 2012. The filing of such reports precluded any charges of child concealment or kidnapping against her."[14] Mere possession of the reports by the prosecution and a failure to provide copies to the defense is not sufficient to show a *Brady* violation.

"'[T]he purpose of *Brady* is to assure that the accused will not be denied access to exculpatory evidence known to the government but unknown to him. . . . There is no *Brady* violation when the accused or his counsel knows before trial about the allegedly exculpatory information and makes no effort to obtain its production.' [Citations.]" (*United States* v. *Valera, supra,* 845 F.2d at pp. 927-928.)

Here, appellant does not allege that the 'good cause' reports were unknown to her. Appellant made the reports, at least verbally, to the authorities. She has not alleged that she was unaware that the reports existed in written form. She has not even alleged that she did not possess her own copies of the report. Since appellant has not shown a *Brady* violation, she has not shown official misconduct and so is not entitled to relief under section 1473.6.

---

**14** Appellant was not charged with child concealment or kidnapping in this case. Moreover, the reports do not have the preclusive effect alleged by appellant. The reporting party must also commence a custody proceeding within 30 days of the filing of the report. (§ 278.7, subd. (c)(2).) The motion does not allege that such proceedings were commenced.

Disposition

The judgment is affirmed. The motion to vacate judgment is denied.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


GOODMAN, J.[*]

We concur:


TURNER, P.J.


MOSK, J.

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.